LADY J. LINGERIE, INC., a Florida corporation;  Buford B. Breland, et al., Plaintiffs-Appellants,

v.

CITY OF JACKSONVILLE, a Florida municipal corporation, Defendant-Appellee.

Milton R. Howard, Emro Corporation, d.b.a. J.R.'s Lounge, Plaintiffs-Appellants,

v.

City of Jacksonville, a Florida municipal corporation, Defendant-Appellee.

Nos. 98-2088, 98-2207.

United States Court of Appeals,

Eleventh Circuit.

May 27, 1999.

Appeals from the United States District Court for the Middle District of Florida. (Nos. 95-181-CIV-J-20A, 95-434-Civ-J-20), Harvey Schlesginer, Judge.

Before DUBINA and BARKETT, Circuit Judges, and JONES*, Senior Circuit Judge.

DUBINA, Circuit Judge:

These consolidated cases require us to determine *de novo* the constitutionality of several provisions of a Jacksonville, Florida (the "City") ordinance that subjects adult businesses to various licensing, health and safety, and zoning regulations.  The plaintiffs/appellants are "lingerie shops" that showcase nude dancing. The City classifies them as "adult entertainment establishments."  Jacksonville, Fla. Adult Ent. & Serv.Code § 150.103(c) (reprinted in appendix).  The district court initially agreed with some of the plaintiffs' objections to the ordinance and preliminarily enjoined enforcement of the licensing and zoning provisions.  In response, the City amended its ordinance.  The district court then lifted its injunction and upheld most of the provisions of the new ordinance.  *See Lady J. Lingerie, Inc. v. City of Jacksonville,* 973 F.Supp. 1428 (M.D.Fla.1997). The plaintiffs then perfected this appeal.

I.

---

*Honorable Nathaniel R. Jones, Senior U.S. Circuit Judge for the Sixth Circuit, sitting by designation.

First we decide whether regulations requiring adult entertainment establishments to apply for zoning exceptions comply with the First Amendment. The City permits adult entertainment establishments to operate as of right in only one area, the CCBD (Commercial/Central Business District) zone. They may also operate in the CCG-2 (Commercial Community/General-2) zone, but only if the zoning board grants them a zoning exception. *See* Jacksonville, Fla. Land Use Code § 656.313(IV)(c)(7) (reprinted in appendix). In addition, the ordinance forbids adult businesses in either zone from locating within specified distances of residences, schools, churches, bars or other adult businesses. *See* Jacksonville, Fla. Land Use Code § 656.1103(a) (reprinted in appendix).

The main objection the plaintiffs have to the ordinance is that there are only *two* sites in the CCBD zone that comply with the distance requirements. This means that practically all adult entertainment establishments must apply for a zoning exception to operate in the CCG-2 zone. The City concedes this, but argues that there are 93-plus available sites in the CCG-2 zone, and that we should include those sites in the calculation. The combined 95 sites, it maintains, are enough.

We usually review zoning regulations in this area under the deferential "time, place, or manner" standards which the Supreme Court delineated in *City of Renton v. Playtime, Theatres, Inc.,* 475 U.S. 41, 50-54, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *see also Int'l Eateries of America, Inc. v. Broward Co., Fla.,* 941 F.2d 1157, 1161-65 (11th Cir.1991). A zoning ordinance is valid if it is narrowly tailored to serve a substantial government interest, and it allows for reasonable alternative avenues of expression. *See Int'l Eateries,* 941 F.2d at 1161-65. Combating the harmful secondary effects of adult businesses, such as increased crime and neighborhood blight, is a substantial government interest. *See City of Renton,* 475 U.S. at 50-52, 106 S.Ct. 925; *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 583-84, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991) (Souter, J., concurring in the judgment).

Most zoning ordinances easily meet these standards, but this ordinance does not. Even if the ordinance is narrowly tailored to serve a substantial government interest, it only allows for reasonable

**2**

alternative avenues of expression if the 93-plus sites in the CCG-2 zone count. But to operate in the CCG-2 zone, an adult entertainment establishment must apply for an exception. This makes an exception the equivalent of a license. The City does have a separate licensing procedure for adult entertainment establishments (for which, incidentally, a zoning exception is a prerequisite), but the indispensability of the zoning exception persuades us to treat it like a license as well.

As a form of prior restraint, licensing schemes commonly contain two defects: discretion and the opportunity for delay. An ordinance that gives public officials the power to decide whether to permit expressive activity must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid. *See Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969). Licensing ordinances must also require prompt decisions. An ordinance that permits public officials to effectively deny an application by sitting on it indefinitely is also invalid. *See Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965). Jacksonville's zoning exceptions process contains both defects.

A.    *Discretion*

Section 656.131 of the Jacksonville Land Use Code specifies the procedures for obtaining a zoning exception. *See* Jacksonville, Fla. Land Use Code § 656.131 (reprinted in appendix). The procedures apply to applicants of all sorts—not just adult businesses. Subsection (c)(1) contains the criteria the zoning board must consider in deciding whether to grant exceptions. These are run-of-the-mill zoning considerations: compatibility with contiguous uses, environmental impact, effect of pedestrian traffic, and so on. But they are just a floor; subsection (c)(2) permits the board to impose more restrictive requirements on adult businesses.

The district court held that subsection (c)(2) is unconstitutional, and severed that provision from the rest of the ordinance. The City does not appeal that part of the judgment. Instead, the plaintiffs appeal the

part of the judgment that upheld all of the (c)(1) criteria. The district court found that these factors (in the absence of subsection (c)(2)) sufficiently limit the board's discretion. We disagree.

The standard incantation of the *Shuttlesworth* principle is that statutes may not give public officials "unbridled" discretion to deny permission to engage in constitutionally protected expression. *E.g., City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988) (citing *Shuttlesworth,* 394 U.S. at 151, 89 S.Ct. 935). This implies that some measure of discretion is acceptable, but the cases show that virtually any amount of discretion beyond the merely ministerial is suspect. Standards must be *precise* and *objective. See, e.g., Shuttlesworth,* 394 U.S. at 150-51, 89 S.Ct. 935 ("narrow, objective, and definite"); *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater,* 2 F.3d 1514, 1547-48 (11th Cir.1993) ("definite and precise"); *see also Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.,* 452 U.S. 640, 649, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981) (upholding "first-come, first-served" method of allocating booths at the state fair); *Church of Scientology,* 2 F.3d at 1548 (labeling city clerk's duty to obtain information from applicants for solicitation licenses "purely ministerial").

Such is not the case with subsection (c)(1). None of the nine criteria is precise and objective. All of them—individually and collectively—empower the zoning board to covertly discriminate against adult entertainment establishments under the guise of general "compatibility" or "environmental" considerations. Jacksonville, Fla. Land Use Code § 656.131(c)(1)(ii) & (iii). Even the seemingly-innocuous fire safety provision is too broad. It does not say "there must be *x number* of doors per square foot"; it says that buildings must be "*sufficiently accessible* to permit entry onto the property by fire, police, rescue and other services." *Id.* § 656.131(c)(1)(viii) (emphasis added). This is neither precise nor objective.

To be clear, the City may still use the (c)(1) criteria (and (c)(2), for that matter) for applicants who are not entitled to First Amendment protection. We only find troublesome the application of the otherwise-valid zoning criteria to adult businesses like the plaintiffs'.

B.      *Delay*

The opportunity for public officials to delay is another form of discretion. Recognizing this, the Supreme Court held in *Freedman* that a Maryland movie censorship law violated the First Amendment because it did not require prompt decisions. In a later case, *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion), a majority of the Court (the plurality plus three concurring Justices) applied *Freedman* to an adult business licensing scheme. *See also id.* at 238, 110 S.Ct. 596 (Brennan, J., concurring). Specifically, the Court agreed that ordinances must contain two procedural safeguards to ensure prompt decision-making: (1) licensing officials must be required to make prompt decisions; and (2) prompt judicial review must be available to correct erroneous denials. *See id.* at 228-30, 110 S.Ct. 596; *Redner v. Dean,* 29 F.3d 1495, 1500 (11th Cir.1994). The same safeguards are required here.

First, the ordinance fails to put any real time limits on the zoning board. The board must hold a public *hearing* within 63 days after a business applies for an exception. *See* Jacksonville, Fla. Land Use Code § 656.131(c)(4). But nothing requires a *decision* within 63 days, or any other time period. The ordinance's failure to require a deadline for decision renders it unconstitutional. *See Redner,* 29 F.3d at 1501.

The City concedes that the ordinance does not give the zoning board a deadline for decision, but it points out that the ordinance permits an applicant to begin operating its business 45 days after applying. *See* Jacksonville, Fla. Land Use Code § 656.1109 (reprinted in appendix). Once the board denies an application, the applicant must shut down. *See id.* The City argues that this ensures that a delay in the decision-making process will not keep the plaintiffs from opening.

The defendant county in *Redner* made a similar defense of its ordinance. But that ordinance said that an applicant "may be permitted" to open; it didn't give applicants an absolute right to open. 29 F.3d at 1500-01. The Jacksonville ordinance, in contrast, says that an applicant "may begin operating [his] facility" 45 days after applying. Jacksonville, Fla. Land Use Code § 656.1109. This leaves no discretion in the City's hands to keep an adult business closed before denying its request for an exception.

**5**

Does it matter that an applicant may begin operating while the board is still considering its application? We think not. The ordinance only permits applicants to operate conditionally. Once the board denies an application for an exception, the applicant must close its doors. A conditional exception is no exception at all. A business can scarcely afford to operate in limbo, not knowing whether the City will shut it down the next day or not. Further, *Freedman*'s requirement that the status quo be maintained while public officials are deciding does not eliminate the requirement that the decision itself must be prompt. (And anyway, the status quo here is no zoning exception.)

As for the second procedural safeguard, we note that this ordinance does not specifically provide for prompt judicial review of the zoning board's decisions. This may not be fatal. We have never squarely held whether an explicit judicial review provision is essential. It may be enough that state law provides a general right to judicial review of administrative decisions. *See Redner,* 29 F.3d at 1501-02 & n. 9 (discussing *Cent. Florida Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515 (11th Cir.1985), and *Miami Herald Publishing Co. v. City of Hallandale,* 734 F.2d 666, 676 (11th Cir.1984)). Still, the plaintiffs have not argued this issue on appeal, so we leave it undecided.

To conclude, we want to emphasize that it is not difficult to draft an ordinance that addresses the harmful secondary effects of adult businesses without running afoul of the First Amendment. This ordinance, however, is unconstitutional because it channels nearly all adult entertainment establishments through the exceptions process. That process in turn gives the zoning board discretion to delay a decision indefinitely or to covertly deny applications for content-sensitive reasons. The plaintiffs may operate as of right in the CCBD and CCG-2 zones, as long as they comply with the distance limitations. We leave it to the district court on remand to decide whether they may also operate in other parts of the City.

II.

Next, the plaintiffs challenge two content-neutral provisions: first, an hours of operation rule that requires adult entertainment establishments to close from 2:00 a.m. until noon every day, and second, a rule

requiring that rooms in adult entertainment establishments be at least 1000 square feet in area. These rules are content-neutral because the City enacted them not to suppress the expressive content of nude dancing, but to alleviate the harmful secondary effects with which adult businesses are commonly associated.

First we must choose which test applies to these regulations. There are two possibilities. The first is the "time, place, or manner" test the Supreme Court used to evaluate the zoning regulations in *City of Renton.* The Court initially developed this test to review restrictions on expression taking place in public fora, but in *City of Renton,* it used this test to evaluate the validity of zoning regulations. *See Barnes,* 501 U.S. at 566, 111 S.Ct. 2456 (plurality opinion) (citing *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), and *City of Renton,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29). *City of Renton* says that a "time, place, or manner" regulation must be narrowly tailored to serve a substantial government interest, and it must allow for reasonable alternative avenues of expression. *See* 475 U.S. at 50-54, 106 S.Ct. 925; *Int'l Eateries,* 941 F.2d at 1161-65.

The alternative is the four-part test the Court laid out in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). This test has been used to evaluate regulations of expressive conduct—conduct that contains both "speech" and "nonspeech" elements. *Id.* at 376, 88 S.Ct. 1673. In *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (plurality opinion), both the plurality and Justice Souter, *see id.* at 581, 111 S.Ct. 2456 (Souter, J., concurring in the judgment), used this test to resolve a challenge by nude dancing establishments to a state law that banned public nudity. The test permits government regulation of expressive conduct "if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673.

**7**

The Supreme Court has observed that the expressive conduct test of *O'Brien* and *Barnes* and the "time, place, or manner" test of *City of Renton* "embody much the same standards." *Barnes,* 501 U.S. at 566, 111 S.Ct. 2456 (plurality opinion) (discussing *Clark v. Community for Creative Non-Violence,* 468 U.S. 288, 298 & n. 8, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984)). Still, which test we choose at least determines how we approach these questions, even if it doesn't affect the outcome. And for that matter, our choice of which test to use may occasionally be outcome determinative. In *Ward,* for instance, a "time, place, or manner" case, the Court said that the means chosen are narrowly tailored as long as they are "not substantially broader than necessary to achieve the government's interest." 491 U.S. at 800, 109 S.Ct. 2746. Contrast this with *O'Brien,* in which the Court said that regulation of expressive conduct may be "no greater than is essential to the furtherance of [the government's] interest." 391 U.S. at 377, 88 S.Ct. 1673. The Court is surely right to suggest that these tests are *generally* the same. *See Clark,* 468 U.S. at 298, 104 S.Ct. 3065 (*O'Brien* 's four-part test, "in the last analysis, is little, if any, different from the standard applied to time, place, or manner restrictions"). But in the occasional case, there may be a difference between "not substantially broader" and "no greater than is essential."

We need not decide whether this is that occasional case. We decide only one case at a time, and in this case, *City of Renton* guides our inquiry. The *City of Renton* test is appropriate because the rules we consider today—the hours of operation and 1000 square foot provisions—regulate "time" and "place" in the "time, place, or manner" sense. They affect, but do not directly regulate, the expressive conduct that is the basis of the plaintiffs' First Amendment challenges: nude dancing. This is different from the draft card burning statute in *O'Brien* and the indecency law in *Barnes.* Those laws regulated the *how* of expressive conduct, as opposed to the where or the when, and they did so in a way that made the messages less potent. The hours of operation and 1000 square foot rules are different.

*City of Renton* requires that these rules be narrowly tailored to serve a substantial government interest, and that they allow for reasonable alternative avenues of expression. *See* 475 U.S. at 50-54, 106

**8**

S.Ct. 925; *Int'l Eateries,* 941 F.2d at 1161-65. A rule is narrowly tailored as long as it is "not substantially broader than necessary to achieve the government's interest." *Ward,* 491 U.S. at 800, 109 S.Ct. 2746.

Whether the hours of operation rule is valid is a close question. *See* Jacksonville, Fla. Adult Ent. & Serv.Code § 150.422(a) (reprinted in appendix). When we asked counsel for the City at oral argument why the City requires adult entertainment establishments to close from 10:00 a.m. until noon (the plaintiffs limit their argument to these hours), he could not come up with a reason. Nor can we. The question is whether we need a reason.

The plaintiffs concede that ample evidence exists to justify requiring them to close during the late evening hours, so the hours of operation rule *as a whole* indisputably serves a substantial government interest. But the plaintiffs would have us look at the City's reasons for this rule on an hour by hour basis. There is no evidence, they submit, of a substantial government interest to justify requiring adult businesses to close from 10:00 a.m. until noon. This is a clever argument, but it confuses the requirement that a regulation serve a substantial government interest with the requirement that it be narrowly tailored to that end. We look at the provision *as a whole* to decide whether it serves a substantial government interest. Since it does, we ask whether it is narrowly tailored.

We can imagine an hours of operation rule drawn so broadly as to not be narrowly tailored, but we decline to scrutinize the City's reasons for this rule as closely as the plaintiffs would have us do. If we were to side with the plaintiffs here, the next litigants would argue whether evidence of secondary effects at 6:15 in the morning justifies requiring adult businesses to close at 9:30, or whether evidence from 9:30 justifies requiring them to close at 10:45. That sort of line-drawing is inconsistent with a narrow tailoring requirement that only prohibits regulations that are "substantially broader than necessary." *Ward,* 491 U.S. at 800, 109 S.Ct. 2746; *but cf. O'Brien,* 391 U.S. at 377, 88 S.Ct. 1673 (regulation may be no greater than is *essential* to the government interest). The issue we face today is, of course, a closer question, but we conclude that the hours of operation rule is "not substantially broader than necessary." It is therefore narrowly tailored.

**9**

Since the rule also leaves open reasonable alternative avenues of expression—adult businesses may stay open fourteen hours a day, seven days a week—it is valid.

We also conclude that the 1000 square foot rule is valid. *See* Jacksonville, Fla. Adult Ent. & Serv.Code § 150.301(g) & (h) (reprinted in appendix). Ample evidence, from Jacksonville and elsewhere, supports the district court's finding that illegal and unhealthy activities take place in small rooms at adult entertainment establishments. One thousand square feet is not that large, so we can't say that this rule is substantially broader than necessary.

Still, the plaintiffs argue that the 1000 square foot rule will force them to move. At least two of the plaintiffs can't comply in their present locations. One plaintiff's total floorspace is only 850 square feet, and another can't remodel because of structural constraints. As we see it, though, this doesn't matter. The test is whether the regulation leaves open reasonable *alternative* avenues of expression; it does not guarantee that the plaintiffs will be able to operate in their present locations.

Without the zoning ordinance confining them, there are plenty of places the plaintiffs can move to comply with this rule. The plaintiffs' own expert testified that at least 40% of the available sites in Jacksonville are large enough to accommodate 1000 square foot rooms. There is no evidence to indicate that this figure is not also representative of the CCG-2 zone. Forty percent of 93-plus sites is enough.

III.

The plaintiffs next challenge the validity of a provision that makes an applicant ineligible for an adult entertainment license if the Sheriff has recently revoked a license for the same premises. *See* Jacksonville, Fla. Adult Ent. & Serv.Code § 150.214 (reprinted in appendix). A site is ineligible until the second October 1 after the Sheriff revokes the license. *Id.* This site disability provision applies even to an applicant with a clean record who happens to buy or lease an affected site for use as an adult entertainment establishment.

We conclude that none of the plaintiffs has standing to challenge this provision because none is injured. Not only has none of the plaintiffs applied for a license for an affected site, but there is no evidence

that there are any affected sites in Jacksonville. If there were, the plaintiffs could at least say that the site disability provision limits their choice of where to move. But without evidence of affected sites, the plaintiffs can't even say that. So we dismiss this claim.

IV.

We now turn our attention to a provision that requires corporate applicants for adult business licenses to disclose the names of "principal stockholders." Jacksonville, Fla. Adult Ent. & Serv.Code § 150.205(a)(1)(iii) (reprinted in appendix). A "principal stockholder" is one who owns at least 10% of the stock of a corporation. *Id.* § 150.103(k) (reprinted in appendix). If no stockholder owns more than 10%, then all stockholders are "principal stockholders." *Id.* The plaintiffs argue that this unconstitutionally chills their right to free expression. The City responds that the plaintiffs do not have standing to challenge this provision, but that even if they do, the disclosure provision is valid.

We are satisfied that at least one of the plaintiffs has standing to challenge this rule. The ordinance requires corporations to disclose principal stockholders' names, and Lady J. Lingerie is a corporation.

Compelled disclosure of the sort the Jacksonville ordinance entails threatens to stymie the exercise of First Amendment freedoms—the so-called "chilling effect"—so it must survive "exacting scrutiny." *Buckley v. Valeo,* 424 U.S. 1, 64, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Specifically, there must be a "relevant correlation" or a "substantial relation" between requiring disclosure of principal stockholders' names and a substantial government interest. *Id.* (citations omitted); *see also NAACP v. Alabama,* 357 U.S. 449, 463-64, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958) (government interest must be substantial).

Here the government interest is substantial, but we do not see a "relevant correlation" or a "substantial relation" between the names of principal stockholders and the harmful secondary effects of adult entertainment establishments. The City's best argument is that principal stockholders tend to have a discernable influence on management, and that the City needs to keep an eye on who is running adult businesses in town. But stockholders, *qua* stockholders, do not run corporations; officers and directors do.

**11**

The City can enforce its rules through them. *See Acorn Inv., Inc. v. City of Seattle,* 887 F.2d 219, 226 (9th Cir.1989); *cf. East Brooks Books, Inc. v. City of Memphis,* 48 F.3d 220, 226 (6th Cir.1995) (invalidating an ordinance requiring disclosure of all stockholders' names); *Genusa v. City of Peoria,* 619 F.2d 1203, 1216-17 (7th Cir.1980) (invalidating an ordinance requiring all stockholders owning more than 10% of the stock of an applicant to submit various personal data to licensing officials). Accordingly, we conclude that this provision is unconstitutional.

V.

The final provision the plaintiffs challenge makes owners of adult entertainment establishments criminally liable for acts committed by their servants, agents and employees. *See* Jacksonville, Fla. Adult Ent. & Serv.Code § 150.510 (reprinted in appendix). Not all acts are imputable, only those acts done within a servant, agent or employee's scope of authority under the owner. *See id.* § 150.510(b). For their first five convictions, owners are punished by either a fine *or* 10 days in jail; for the sixth and subsequent offenses, the penalty is a fine *and* up to 90 days in jail. *See id.* § 150.510(c).

*Respondeat superior* is now a familiar concept in the context of "public welfare" crimes. These offenses are not crimes in the traditional sense; instead, they are a means of regulating activities that pose a special risk to the public health or safety. In *United States v. Park,* 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), for example, the defendant was the president of a national retail food corporation that got into trouble with the Food and Drug Administration for having rodent-infested warehouses. The Court upheld his conviction because, as president, he was in a "responsible relation" to the unlawful failure to maintain sanitary warehouses. *Id.* at 673-76, 95 S.Ct. 1903; *see also United States v. Dotterweich,* 320 U.S. 277, 285, 64 S.Ct. 134, 88 L.Ed. 48 (1943).

But significantly, Park's only punishment was a fine; incarceration is a different matter. Commentators distinguish public welfare offenses from offenses for which the penalty involves imprisonment, and argue that *respondeat superior* is inappropriate for these "true crimes." Francis Bowes

**12**

Sayre, *Criminal Responsibility for the Acts of Another,* 43 Harv.L.Rev. 689, 717 (1930); *see also* Wayne R. LaFave & Austin W. Scott, Jr., *Criminal Law* 255 (2d ed.1986); Rollin M. Perkins & Ronald N. Boyce, *Criminal Law,* 913-14 (3d ed.1982). We agree and hold that due process prohibits the state from imprisoning a person without proof of some form of personal blameworthiness more than a "responsible relation."

The upshot is this: criminal liability based on *respondeat superior* is acceptable if the defendant is in a "responsible relation" to the unlawful conduct or omission, but only if the penalty does not involve imprisonment. A defendant is in a "responsible relation" if he has the power to prevent violations from occurring. *See Park,* 421 U.S. at 670-73, 95 S.Ct. 1903. The owner liability provision makes imprisonment a possibility—indeed it is a certainty for the sixth and subsequent offenses. It is therefore unconstitutional at least to that extent.

We can salvage the fine, however, if the ordinance requires proof of a "responsible relation." Proof of a defendant's position alone is not enough, *see id.* at 658, 95 S.Ct. 1903, but this provision requires more. Only acts "done within the scope of [a] servant, agent or employee's scope of authority under the owner" are imputable. Jacksonville, Fla. Adult Ent. & Serv.Code § 150.510(b). We understand this to mean that an owner-defendant is only responsible for acts or omissions that he has the power to prevent. For this reason, we leave intact the City's authority to fine owners for violations committed by their employees.

Personal blameworthiness can take two forms: unlawful act and unlawful intent. It is common to convict and imprison defendants for the acts of others—witness conspiracy law. But conspiracy still requires individualized proof of unlawful intent. The converse is strict liability, which requires proof of act but not intent. We decline to consider whether *mens rea* is an indispensable constitutional requirement for sending someone to prison. *Cf. Staples v. United States,* 511 U.S. 600, 616, 114 S.Ct. 1793, 128 L.Ed.2d 608 (1994) (penalty of imprisonment suggests that statute should not be construed as dispensing with *mens rea* ). Instead, we hold that due process *at least* requires individualized proof of intent *or* act. The owner liability provision requires neither, so the City may not use it to incarcerate owners.

VI.

The last issue the plaintiffs raise concerns their entitlement to damages for 10 days they were closed after the City implemented the initial licensing and zoning provisions which the district court struck down. This claim is meritless. The district court correctly held that the plaintiffs are not entitled to damages.

For the foregoing reasons, we affirm the district court's judgment in part, reverse in part, dismiss in part, and remand this case for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, DISMISSED in part, and REMANDED.

APPENDIX

*Jacksonville, Fla. Code, Title VI, Chapter 150 (Adult Entertainment and Services Code—Businesses, Trades and Occupations)*

*150.103 Definitions.* In this chapter, unless the context otherwise requires:

* * *

(c) *Adult entertainment establishment* means a commercial establishment where the owner, or an employee or agent of the owner, suffers, permits, allows, encourages, or pays any person to engage in nude entertainment on the premises. Adult entertainment establishment also includes any establishment which contains or operates an adult entertainment booth.

* * *

(k) *Principal stockholder* means an individual, partnership or corporation that owns or controls, legally or beneficially, ten percent or more of a corporation's capital stock and includes the officers, directors and principal stockholders of a corporation that is a principal stockholder under this chapter; provided, that if no stockholder of a corporation owns or controls, legally or beneficially, at least ten percent of the capital stock, all stockholders shall be considered principal stockholders; and further provided, that if a corporation

is registered with the Securities and Exchange Commission or pursuant to Chapter 517, Florida Statutes and its stock is for sale to the general public, it shall not be considered to have any principal stockholders.

* * *

*150.205 License application;  application fee.*

(a) A person desiring to engage in the business of operating an adult bookstore, adult motion picture theater, adult entertainment establishment, or escort service shall file with the Sheriff a sworn application on forms supplied by the Sheriff.  The application shall contain at least the following information and be accompanied by the following documents:

(1) If the applicant is:

(i) An individual, his name.

(ii) A partnership, the full name of the partnership and the name of the managing partner and the names of all other partners, whether general or limited, accompanied by the partnership instrument or a certified copy thereof.

(iii) A corporation, the exact corporate name and state of incorporation and the name of the chief executive officer and the names of all other officers, directors and principal stockholders, accompanied by the articles of incorporation and all amendments thereto and the certificate of incorporation, or certified copies thereof.

* * *

*150.214 Issuance of license for prior revoked license.*

When a license is revoked by the Sheriff, no license shall be issued for the location formerly covered by the revoked license.  The period of time that a license shall be prohibited under this section shall be one year from the October 1 following revocation.

*150.301 General requirements.*

In addition to the special requirements contained in this part, unless otherwise exempted, each adult bookstore, adult motion picture theater and adult entertainment establishment, shall meet each of the requirements of this section.

* * *

(g) All premises shall have an entrance room or lobby, i.e., the room which is entered from the outside, and sanitary facilities as set forth in subsection (e). The entrance room or lobby may be as large or as small as the licensee chooses.

(h) All other rooms in premises must either:

(1) be not less than one thousand square feet in area; or

(2) be clearly marked in letters not less than two inches in height "No Customers or Patrons Allowed."

* * *

*150.422 Hours of operation.*

(a) Adult entertainment facilities, adult bookstores and adult movie theaters shall not be open between the hours of 2:00 a.m. and noon.

* * *

*150.510 Owner responsibility.*

(a) As used in part, *owner* shall mean and include the owner, and co-owner, partner, managing partner or chief executive officer.

(b) All acts of any servant, agent or employee, paid or unpaid, of an owner shall be imputed to the owner and be deemed to be an act of the owner if done within the scope of such servant, agent or employee's scope of authority under the owner.

(c) Any owner convicted of violating this chapter due to responsibility imposed pursuant to this section shall be upon conviction punished as follows:

(1) for the first five offenses, by a fine of not less than two hundred fifty dollars nor more than five hundred dollars, or by imprisonment up to ten days in jail;

**16**

(2) for the sixth and subsequent offenses, by a fine of not less than three hundred fifty dollars nor more than five hundred dollars and by imprisonment of not less than twenty nor more than ninety days.

*Jacksonville, Fla. Code, Section 656 (Zoning Code—Land Use)*

*656.131 Zoning exceptions*

* * *

(c) With respect to acting upon applications for zoning exceptions:

(1) The Commission shall issue an order to grant the exception only if it finds from a preponderance of the evidence of record presented that the proposed use meets, to the extent applicable, the following standards and criteria:

(i) Will be consistent with the Comprehensive Plan, including any subsequent plan adopted by the Council pursuant thereto;

(ii) Will be compatible with the existing contiguous uses or zoning and compatible with the general character of the area, considering population density, design, scale and orientation of structures to the area, property values, and existing similar uses or zoning;

(iii) Will not have an environmental impact inconsistent with the health, safety and welfare of the community;

(iv) Will not have a detrimental effect on vehicular or pedestrian traffic, or parking conditions, and will not result in the generation or creation of traffic inconsistent with the health, safety and welfare of the community;

(v) Will not have a detrimental effect on the future development of contiguous properties or the general area, according to the Comprehensive Plan, including any subsequent amendment to the plan adopted by the Council;

(vi) Will not result in the creation of objectionable or excessive noise, lights, vibrations, fumes, odors, dust or physical activities, taking into account existing uses or zoning in the vicinity;

(vii) Will not overburden existing public services and facilities;

(viii) Will be sufficiently accessible to permit entry onto the property by fire, police, rescue and other services; and

(ix) Will be consistent with the definition of a zoning exception, and will meet the standards and criteria of the zoning classification in which such use is proposed to be located, and all other requirements for such particular use set forth elsewhere in the Zoning Code, or otherwise adopted by the Planning Commission.

**17**

(2) In issuing its order to grant a zoning exception as provided in the Zoning Code, the Commission may place more restrictive requirements and conditions on applicants than are provided in the Zoning Code. A recommended order to grant a zoning exception shall not be granted unless and until the procedures in this chapter have been complied with.

(3) The use for which a zoning exception has been granted by the Commission shall not be commenced by the owner, his agent or lessee until such time as the order is deemed to be final or a final order has been issued and all of the improvements stipulated in the grant of exception necessary for the orderly use of the property have been accomplished.

(4) Unless a longer time is mutually agreed upon by the applicant and the Commission in the particular case, a public hearing shall be held by the Commission to consider an application for zoning exception within not more than sixty-three days from the date of filing of the completed application. Notice of the public hearing shall be made as provided in s. 656.136 and a party shall be heard in person or by agent or attorney.

(5) The violation of the terms of an exception, including conditions and safeguards which may be a part thereof, shall be deemed a violation of the Zoning Code and punishable as provided in the Zoning Code.

*656.313 Community/General Commercial Category.*

IV. *Commercial Community/General-2 (CCG-2) District.*

\* \* \*

(c) *Permissible uses by exception.*

\* \* \*

(7) Adult entertainment and service activities.

\* \* \*

*656.1101 Definitions.* For the purposes of Part 11, the following definitions shall apply:

(a) *Adult entertainment or service facility* means an escort service, adult bookstore, nude massage parlor, adult motion picture theater or adult entertainment establishment, as defined in Chapter 150, Ordinance Code.

\* \* \*

*656.1103 Distance limitations;  exception.*

(a) No adult entertainment or service facility shall be located on a site unless the site equals or exceeds all of the distance limitations required by this subsection;

> (1) One thousand feet from the boundary of another adult entertainment or services facility.

> (2) Five hundred feet from the boundary of a residential district.

> (3) One thousand feet from an established school or church.

> (4) Five hundred feet from the boundary of any business which has an on premises consumption beverage license.

(b) Notwithstanding any ordinance to the contrary, and notwithstanding any prior legal status of any adult entertainment or services facility, as of March 1, 1995, no adult entertainment or service facility shall be located on a site or parcel or in a structure which, in whole or in part, has been granted an on premises consumption beverage license or which is a bottle club.

(c) Notwithstanding any ordinance to the contrary, and notwithstanding any prior legal status of any adult entertainment or services facility, as of March 1, 1995, no adult entertainment or services facility shall be located on a site or parcel or in a structure which, in whole or in part, is within five hundred feet of the boundary of any business which has an on-premises consumption beverage license.

*656.1109 Conditional commencement without exception*

Where a person has applied for an exception in order to operate an adult entertainment [establishment] in a Community/Commercial General-2 zoning district, the applicant may begin operating the facility forty-five days after submitting a completed application.  The conditional operation shall be permitted only until such time as the exception is granted or denied and judicial review is completed by a trial court of competent jurisdiction.  This conditional grant to operate shall not permit the applicant to operate in violation of any other ordinance or law.  In particular the applicant shall not operate in violation of any distance requirement set forth in this chapter.

BARKETT, Circuit Judge, concurring in part and dissenting in part:

**19**

I agree with much of the majority's opinion in this case. However, I do not believe that Jacksonville's hours of operation provision can be upheld under the "time, place, and manner" analysis set forth in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986).[1]

I agree that the hours of operation provision is a content-neutral restriction and that it serves the substantial governmental interest of eliminating the secondary effects produced by the late-night operations of adult entertainment establishments. Under *Renton,* however, this provision violates the First Amendment because it is not narrowly tailored to serve this substantial government interest. The ordinance requires the closure of adult entertainment establishments during early morning hours when the city concedes there are no secondary effects. *Renton*'s narrow tailoring requirement, however, requires a city to draw its ordinances "to affect only that category of theaters shown to produce the unwanted secondary effects...." *Renton,* 475 U.S. at 52, 106 S.Ct. 925. By analogy, it seems to me that to justify closure, the city must limit its regulation to the hours where such secondary effects exist. Because the city has, without any justification at all, barred adult entertainment establishments from operating during the late morning hours with no indication of any secondary effects, the ordinance is "substantially broader than necessary," *Ward v. Rock Against Racism,* 491 U.S. 781, 800, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), and must be invalidated.[2] I believe that the majority's

---

[1]I would also note that the *Renton* test, not the analysis set forth in *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) and applied by a plurality in *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991), is the applicable standard. Unlike the ordinance at issue in *Renton* and the one before us in this case, *Barnes* dealt with a generally-applicable ban on public nudity, considering whether the ban on public nudity could be constitutionally applied to nude dancing in an adult entertainment establishment. Because we are considering a regulation that singles out adult entertainment establishments for regulation, rather than a generally-applicable statute that has an incidental effect on adult entertainment, *Renton,* not *Barnes,* provides the appropriate standard of review. We have previously recognized this distinction between *Renton* and *Barnes.* In *International Eateries of America, Inc. v. Broward County, Fla.,* 941 F.2d 1157 (11th Cir.1991), we upheld a county ordinance prohibiting adult nightclubs within 500 feet of a residential district and within 1,000 feet of a church. We pointed out that *Renton* and the case we were considering involved ordinances that only applied to adult entertainment, while *Barnes* involved a ban on all public nudity. Accordingly, we concluded that, even after *Barnes,* "*Renton* still controls our analysis." *Id.* at 1161.

[2]Although the city could certainly mandate closure if it showed secondary effects during these late morning hours, it does not even purport to make such a showing and so this ordinance is distinguishable from

assertion that the city needs no reason to force adult entertainment establishments to close during the late morning hours flies in the face of *Renton,* which makes clear that where a city regulates to avoid secondary effects, its regulation must be drawn "to affect only that category of theaters shown to produce the unwanted secondary effects...." *Renton,* 475 U.S. at 52, 106 S.Ct. 925.

The majority offers no authority for its position. I believe that the Fifth Circuit's opinion in *Beckerman v. City of Tupelo, Miss.,* 664 F.2d 502 (5th Cir. Unit A Dec.1981), although not binding precedent, is directly on point and should guide our analysis. In *Beckerman,* the court invalidated a city ordinance forbidding parades after 6 P.M., finding the ban substantially broader than necessary to effectuate the city's interest in nighttime security. The court explained that because the sun did not set in Tupelo until well after 6 P.M. for a good part of the year, the ordinance "unnecessarily restricted [individuals] in the time in which they may parade." *Id.* at 512. Although the court recognized "the difficulty Tupelo faces in pinpointing the exact time at which the nighttime security problems arise," *id.,* it found the city's use of a 6 P.M. cutoff overbroad since nighttime security could not justify banning parades during the summer when the sun does not set until approximately 8:30 P.M. *Id.*

We face a similar situation here. Although a city may unquestionably regulate the hours of operation of an adult entertainment establishment to avoid the secondary effects associated with late night-hours, the city here, like the city in *Beckerman,* has done so in an overbroad manner by requiring closure during the late morning hours when no secondary effects have been shown to exist. The fact that the ordinance as a whole

---

the other ordinances which have been upheld against First Amendment challenges. *See Ben Rich Trading, Inc. v. City of Vineland,* 126 F.3d 155, 160-63 (3d Cir.1997) (upholding ban on operating adult entertainment establishments before 8:00 A.M. and after 10 P.M.); *Mitchell v. Commission on Adult Entertainment Establishments of Delaware,* 10 F.3d 123, 131-39 (3d Cir.1993) (upholding ban on operating adult entertainment establishments before 10:00 A.M. and after 10:00 P.M. and all day Sunday); *Star Satellite, Inc. v. City of Biloxi,* 779 F.2d 1074, 1079-80 (5th Cir.1986) (upholding ban on operating adult entertainment establishments before 10:00 A.M. and after midnight and all day Sunday); *see also National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 741-45 (1st Cir.1995) (upholding ban on operating entertainment business between 1:00 A.M. and 6:00 A.M.).

here serves to address the problem of late evening hours cannot save this ordinance any more than the fact

that the ordinance in *Beckerman,* taken as a whole, addressed problems of nighttime security.