BOSS CAPITAL, INC., a Florida Corporation, Plaintiff-Appellant,

v.

CITY OF CASSELBERRY, a Florida Municipal Corporation, Defendant-Appellee.

No. 98-2802.

United States Court of Appeals,

Eleventh Circuit.

Sept. 3, 1999.

Appeal from the United States District Court for the Middle District of Florida.(No. 96-CV-463-ORL-22B), Anne C. Conway, Judge.

Before DUBINA and HULL, Circuit Judges, and O'KELLEY*, Senior District Judge.

DUBINA, Circuit Judge:

Boss Capital, Inc. owns strip clubs.  It wants to open a club in a building it leases in Casselberry, Florida, but Casselberry's zoning ordinance prohibits it from operating at that location.  In this appeal, Boss Capital challenges the constitutionality of Casselberry's zoning ordinance.  It also challenges the constitutionality of the licensing provisions of Casselberry's adult entertainment ordinance.  The district court granted summary judgment for Casselberry on both of these claims.  We conclude that the licensing provisions are valid but that the validity of the zoning provision turns on a factual question the district court left unresolved.  We therefore affirm in part and remand this case to the district court with instructions to reconsider the validity of the zoning provisions in light of this opinion.

I.

We address the zoning ordinance first.  An adult entertainment establishment in Casselberry may operate only in the C-G (Commercial-General) zoning district, but even within that zone, it may not operate within 1000 feet of a church, a school, a public park or recreation area, another adult entertainment establishment, or an area zoned for residential use.  *See* Casselberry Code art. III, § 14-75(a) (reprinted in

*Honorable William C. O'Kelley, Senior U.S. District Judge for the Northern District of Georgia, sitting by designation.

appendix). The ordinance grandfathers establishments in existence in Casselberry as of the ordinance's effective date. *See* Casselberry Code art. III, § 14-76(a) (reprinted in appendix). All the parties agree that if one of the existing establishments closes, a new adult entertainment establishment may operate in the same location as a "nonconforming use" until the use "is removed or abandoned, or ceases for a continuous period of more than 90 days." Casselberry Code part III, § 2-8.9 (reprinted in appendix).

Boss Capital leased a building in Casselberry with plans to open a strip club there. The building is almost 1000 feet from residentially zoned property, but almost wasn't good enough. Casselberry refused to permit Boss Capital to use the site for adult entertainment.

Appropriately, the district court turned to *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), to decide whether Casselberry's zoning ordinance is constitutional. That case holds that municipalities may constitutionally apply zoning regulations to nude dancing establishments as long as the regulations are narrowly tailored to serve a substantial government interest and leave open reasonable alternative avenues of expression. *See id.* at 50-54, 106 S.Ct. 925. The dispute in this case is whether Casselberry's zoning ordinance leaves open reasonable alternative avenues of expression.

Whether a zoning ordinance leaves open reasonable alternative avenues of expression depends on how many sites are available. *See Lady J. Lingerie, Inc. v. City of Jacksonville,* 176 F.3d 1358, 1361 (11th Cir.1999). Availability, in turn, is a matter of economics. A site is available for our purposes as long as adult entertainment establishments may vie for it in the real estate market "on an equal footing with other prospective purchasers and lessees." *City of Renton,* 475 U.S. at 54, 106 S.Ct. 925.

The district court counted six available sites. Two other sites might be available, but factual questions kept the court from deciding on summary judgment whether they are actually available. The district court left those questions unresolved because it held that six sites are enough for a city of Casselberry's population (24,100).

Boss Capital does not appear to dispute that six are enough. Rather, it argues that the six sites the

2

district court included should not count. Three of the sites are outside the city limits. Casselberry insists that these sites should count because they are close to town (978 feet, 121 feet and 1.25 miles). The other three sites the district court counted are in Casselberry, but they are grandfathered sites that do not comply with the ordinance's distance requirements.

Whether a site is available is generally a factual question, but whether the sites outside Casselberry's borders and the grandfathered sites count are legal questions which the district court resolved on summary judgment and we review *de novo. See Parks v. City of Warner Robins,* 43 F.3d 609, 612-13 (11th Cir.1995).

A.

We turn first to the grandfathered sites. The ordinance permits the current occupants to remain where they are for as long as they want, but a new occupant may only operate an adult entertainment establishment at one of the grandfathered sites if no more than 90 days has passed since the last adult entertainment establishment operated there. *See* Casselberry Code art. 3, § 14-76(a); *id.* part III, § 2-8.9. The likelihood that a shoe store or a grocery will move into one of the sites, or that one of the sites will sit vacant for more than 90 days, is, if not great, at least significant. If any of those things happen, the site is no longer available.

Still, for now at least, the three (defeasibly) grandfathered sites *are* available. Boss Capital has every right to outbid its competitors and buy or lease one of the grandfathered sites out from under one of the current occupants. This convinces us to include the grandfathered sites in the "reasonable alternative avenues of expression" equation.

B.

That leaves the three sites outside the city limits. Whether Casselberry may rely on those sites is an issue this court has not yet faced, although the Supreme Court has faced it and left the question open. *See Schad v. Borough of Mount Ephraim,* 452 U.S. 61, 76-77, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981); *id.* at 78, 101 S.Ct. 2176 (Blackmun, J., concurring). We opt to leave it open as well because it is our custom not to decide difficult constitutional questions unless we must. *See Ashwander v. Tenn. Valley Auth.,* 297 U.S. 288,

347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). The district court noted that one or two other sites might be available inside the city limits. If they are, we probably will not have to decide whether the sites outside the city limits should count because four or five sites are most likely adequate for Casselberry.

We do not hold, however, that three sites alone are inadequate for Casselberry. That question too is a difficult one we might not need to decide. Instead, we remand this case to the district court for it to resolve whether the sites inside the city limits are actually available. Then, if it must, it should consider whether the available sites constitute reasonable alternative avenues of expression.

In deciding whether three or four or five sites constitute reasonable alternative avenues of expression, the district court should consider more than just Casselberry's population. It should also consider Casselberry's geographical size, the number of acres available to adult entertainment establishments as a percentage of that size, where the sites are located, the number of adult entertainment establishments currently in existence in Casselberry, and the number of adult entertainment establishments wanting to operate in Casselberry. In short, whether a given number of sites constitutes reasonable alternative avenues of expression is an issue to be resolved on a case-by-case basis, taking into account any factors that may affect whether adult entertainment establishments are on "equal footing with other prospective purchasers and lessees." *City of Renton,* 475 U.S. at 54, 106 S.Ct. 925; *see also Int'l Food & Beverage Sys. v. City of Ft. Lauderdale,* 794 F.2d 1520, 1526 (11th Cir.1986)(referring to "community needs, the incidence of nude bars in other comparable communities, the goals of the city plan, and the kind of city the plans works towards").

In light of this, we affirm the district court's judgment insofar as it held that the grandfathered sites may be considered in the "reasonable alternative avenues of expression" equation. In accordance with our custom of only deciding difficult constitutional questions when necessary, however, we remand this case to the district court for it to determine whether one or two more sites are available inside the city limits. If need be, the district court should then decide whether the total number of sites constitutes reasonable alternative

4

avenues of expression.

## II.

We now turn to Casselberry's adult entertainment licensing ordinance, to which Boss Capital has two objections. Its first objection is that the ordinance does not provide for prompt judicial review in compliance with *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965), because it does not guarantee that courts will promptly *resolve* appeals from administrative license denials. Second, it contends that the ordinance gives licensing officials too much discretion in violation of *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969).

## A.

We have twice pretermitted the question whether *Freedman*'s requirement of prompt judicial review, as reflected in *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (plurality opinion), requires licensing ordinances to explicitly provide for prompt judicial review. *See Lady J. Lingerie,* 176 F.3d at 1363; *Redner v. Dean,* 29 F.3d 1495, 1501-02 & n. 9 (11th Cir.1994) (discussing *Cent. Fla. Nuclear Freeze Campaign v. Walsh,* 774 F.2d 1515 (11th Cir.1985); *Miami Herald Publ'g Co. v. City of Hallandale,* 734 F.2d 666, 675-76 (11th Cir.1984)). As we have observed, a general right to judicial review of administrative decisions may be enough. Casselberry's ordinance contains an explicit judicial review provision, *see* Casselberry Code art. III, § 14-99(c) (reprinted in appendix), so the question in this case is slightly different: whether *Freedman* and *FW/PBS* require a guarantee of prompt judicial *resolution* of license denials.

This is an issue on which there has been some disagreement since the Supreme Court decided *FW/PBS.* Justice O'Connor's plurality opinion in that case says that "there must be the *possibility* of prompt judicial review in the event that [a] license is erroneously denied." *FW/PBS,* 493 U.S. at 228, 110 S.Ct. 596 (emphasis added). Later she says that the Dallas ordinance violates the First Amendment because "[i]t also fails to provide an *avenue for* prompt judicial review...." *Id.* at 229, 110 S.Ct. 596 (emphasis added). In

5

concurrence, Justice Brennan does not explicitly disagree with the plurality opinion on this issue, but he characterizes the right to prompt judicial review differently, referring to it as the right to "a prompt judicial determination." *Id.* at 239, 110 S.Ct. 596 (Brennan, J., concurring) (citing *Freedman,* 380 U.S. at 58-59, 85 S.Ct. 734).

This difference between Justice O'Connor's and Justice Brennan's characterizations of the right to prompt judicial review has spawned a split in the circuits. The First, Fifth and Seventh Circuits hold that for licensing ordinances, prompt judicial review only means *access* to prompt judicial review. *See TK's Video, Inc. v. Denton County,* 24 F.3d 705, 709 (5th Cir.1994), *followed in Grand Brittain, Inc. v. City of Amarillo,* 27 F.3d 1068, 1070-71 (5th Cir.1994) (per curiam); *Graff v. City of Chicago,* 9 F.3d 1309, 1324-25 (7th Cir.1993) (en banc); *Jews for Jesus, Inc. v. Mass. Bay Transp. Auth.,* 984 F.2d 1319, 1327 (1st Cir.1993). On the other side are the Fourth and Ninth Circuits and arguably the Sixth, which hold that *Freedman* and *FW/PBS* require a guarantee of prompt judicial resolution. *See Baby Tam & Co. v. City of Las Vegas,* 154 F.3d 1097, 1101-02 (9th Cir.1998), *followed in 4805 Convoy, Inc. v. City of San Diego,* --- F.3d ---- (9th Cir.1999); *11126 Baltimore Boulevard, Inc. v. Prince George's County,* 58 F.3d 988, 998-1001 (4th Cir.1995) (en banc); *cf. East Brooks Books, Inc. v. City of Memphis,* 48 F.3d 220, 224-25 (6th Cir.1995) (state certiorari procedures an insufficient guarantee of prompt judicial review).

We have not yet decided whether *Freedman* and *FW/PBS* require municipalities to guarantee prompt judicial resolution of appeals from license denials. In *Redner,* the Citrus County ordinance did not even provide access to prompt judicial review. *See* 29 F.3d at 1501-02. We did not hold that mere access is insufficient. *But see 4805 Convoy,* --- F.3d at ---- n.7 (reading *Redner* as saying that access to judicial review is insufficient). We address that issue for the first time today.

Boss Capital makes a good argument that *Freedman* requires prompt judicial resolution of *censorship* decisions, but in the end we conclude that access to prompt judicial review is sufficient for *licensing* decisions. *Freedman* itself unmistakably requires "a prompt final judicial decision." 380 U.S. at 59, 85 S.Ct.

6

734; *see also id.* ("final judicial determination on the merits"; "judicial resolution"). Moreover, *Freedman* 's progeny also require an assurance of a prompt judicial decision. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. at 560, 95 S.Ct. 1239 ("a prompt final judicial determination must be assured") (1975); *United States v. Thirty-Seven (37) Photographs,* 402 U.S. 363, 371-74, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (plurality opinion) (in Part I of the plurality opinion, joined by six Justices, imposing time limits for completion of judicial proceedings in obscenity forfeiture cases); *Blount v. Rizzi,* 400 U.S. 410, 417, 91 S.Ct. 423, 27 L.Ed.2d 498 (1971) ("a final judicial determination on the merits within a specified, brief period").

Still, none of these pre-*FW/PBS* cases involved a licensing ordinance for adult entertainment establishments. Instead they involved censorship. In *Freedman,* for instance, state law authorized public officials to ban movies it found to be obscene. 380 U.S. at 52-53 n. 2, 85 S.Ct. 734. For good reason, *Freedman* ascribes great importance to prompt judicial resolution of the validity of these sorts of decisions; courts' relative institutional insulation from political pressures makes them less apt to erroneously suppress unpopular expression. *See* Henry P. Monaghan, *First Amendment "Due Process",* 83 Harv. L.Rev. 518, 520-24 (1970).

The dangers of censorship are less threatening when it comes to licensing schemes. Unlike censors, who pass judgment on the *content* of expression, licensing officials look at more mundane and ministerial factors in deciding whether to issue a license. *See 11126 Baltimore Boulevard,* 58 F.3d at 1003 (Niemeyer, J., concurring in part and dissenting in part) (no need for a guarantee of a prompt judicial decision in the absence of a *direct* prior restraint on speech); *see also FW/PBS,* 493 U.S. at 229, 110 S.Ct. 596 (Licensing officials do not pass judgment "on the content of any protected speech"; rather, they look at "the general qualifications of each license applicant, a ministerial action that is not presumptively invalid."). Indeed, *Shuttlesworth* limits licensing officials to the mundane and the ministerial. *See Lady J. Lingerie,* 176 F.3d at 1362 (holding that *Shuttlesworth* requires licensing standards to be "*precise* and *objective* "). Furthermore, applicants for adult entertainment licenses, unlike movie distributors who might show a given film in

7

hundreds of theaters around the country, have every incentive to stick it out and see litigation through to its end. *Cf. FW/PBS,* 493 U.S. at 229-30, 110 S.Ct. 596 (plurality opinion) (no need to put burden of going to court and burden of proof on licensing officials because license applicants have the incentive to go to court). The need for a prompt judicial decision is therefore less compelling for licensing ordinances than for censorship schemes.

In sum, although *Freedman* appears to require prompt judicial resolution of censorship decisions, licensing decisions are different. We believe this is a situation for "treating unlike things differently according to their differences." *Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1342 (11th Cir.1999) (en banc). Accordingly, we agree with the First, Fifth and Seventh Circuits and hold that access to prompt judicial review is sufficient for adult entertainment licensing ordinances. Casselberry's ordinance provides that access: "Any decision of the Community Development Department pursuant to Division 2 (License) may be *immediately reviewed* as a matter of right by the Circuit Court upon the filing of an appropriate pleading by an aggrieved party." Casselberry Code art. III, § 14-99(c) (emphasis added). We therefore conclude that Casselberry's ordinance does not run afoul of *Freedman.*

B.

Boss Capital also contends that Casselberry's adult entertainment licensing ordinance is invalid because it gives licensing officials too much discretion in violation of *Shuttlesworth.* Whatever the merits of this argument, we conclude that Boss Capital has not preserved this issue for appeal. Boss Capital's first complaint raised the issue, but Casselberry has since repealed one of the provisions to which Boss Capital initially objected. After that, Boss Capital scarcely mentioned the issue before filing its brief with us. The district court did not address the issue. This is not enough to preserve an issue for appeal, so we decline to address it. *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir.1995) (en banc).

III.

In conclusion, we hold that Casselberry's licensing ordinance is valid and that its zoning ordinance

might be, depending on the district court's determination on remand whether any additional sites are available for adult entertainment establishments.

AFFIRMED in part and REMANDED.

APPENDIX

Casselberry Code of Ordinances

ARTICLE III. ADULT ENTERTAINMENT ESTABLISHMENTS

DIVISION 1. GENERALLY

*Sec. 14-66. Definitions.*

The following words, terms and phrases, when used in this Article, shall have the meanings ascribed to them in this Section, except where the context clearly indicates a different meaning:

\* \* \*

*Adult Performance Establishment*

(a) shall mean an establishment where any employee:

(1)     engages in a private performance or displays or exposes any specified anatomical areas to a patron, regardless of whether the employee actually engages in dancing:

(2)     wears any covering, tape, pastie, or other device which simulates or otherwise gives the appearance of the

APPENDIX—Continued

display or exposure of any specified anatomical areas, regardless of whether the employee actually engages in dancing:

(3)     offers, solicits, or contracts to dance or perform with a patron and accepts any consideration, tip, remuneration or compensation from or on behalf of that person:  or

(4)     dances or performs with or within three (3) feet of a patron and accepts any consideration, tip, remuneration, or compensation from or on behalf of that person.

(b) It is an affirmative defense that an establishment is not an adult performance establishment if the establishment is a bona fide private club whose membership as a whole engages in social nudism or naturalism as in a nudist resort or camp, or such other establishment in which the predominant business or attraction of the establishment is not the offering to customers of a product, service, or entertainment which is intended to provide sexual stimulation or sexual gratification to such customers, and the establishment is not distinguished by an emphasis on or the advertising or promotion of materials relating to or employees depicting, describing, displaying, exposing, or

9

simulating sexual activities or specified anatomical areas.

(c) An adult entertainment establishment shall not be deemed a place provided or set apart for the purpose of exposing or exhibiting a person's sexual organs in a manner contrary to the first sentence of Section 800.03, Florida Statutes, the State's indecent exposure statute as set forth in the decision of the Supreme Court of Florida in the case of *Hoffman v. Carson,* 250 So.2d 891 (Fla.1971), appeal disAPPENDIX—Continued missed 404 U.S. 981, 92 S.Ct. 453, 30 L.Ed.2d 365 (1971).

*Adult entertainment establishment* means an adult arcade, adult bookstore, adult motel, adult performance establishment, or adult theater.

\* \* \*

*Residential zoning district* means any area legally zoned or designated by an adopted comprehensive plan in a manner primarily intended for dwellings.

\* \* \*

*Sec. 14-74. Location generally.*

All adult entertainment establishments within the City of Casselberry, Florida shall be limited to the C-G (Commercial-General) zoning district and shall be subject to all restrictions enumerated in this Code.

*Sec. 14-75. Prohibited locations.*

(a) No person shall cause or permit the establishment, substantial enlargement or transfer of ownership or control of an adult entertainment establishment within 1,000 feet of any other adult entertainment establishment or any church, school, public park or public recreation area, or within 1,000 feet of an area zoned for residential use or designated by an adopted comprehensive plan in a manner primarily intended for dwellings.  For purposes of this Section, the term "substantial enlargement" shall mean increasing the size of the permitted or licensed premises by more than ten percent of the original licensed premises.

(b) For the purposes of this Section, distance measurements shall be made in a straight line, without regard to intervening structures or objects, from the nearest property line of the property used as an APPENDIX—Continued

adult entertainment establishment to the nearest property line of the premises of a church, school, public park or public recreation area, or to the nearest boundary of any area legally zoned or designated by a comprehensive plan in a manner primarily intended for dwellings, without regard to municipal boundaries. Measurement of distances between adult entertainment establishments shall be from lot line to lot line at their nearest points.

*Sec. 14-76. Nonconforming uses.*

(a) *Generally.* An adult entertainment establishment which, on the effective date of the ordinance from which this Article is derived, does not comply with the distance requirements of Section 14-75, shall be subject to the nonconforming use provisions contained in the zoning code of

the City.

(b) *Residential rezoning.* If an area is zoned residential or designated by a comprehensive plan in a manner primarily intended for dwellings for the first time, or if an area is rezoned for residential use or redesignated by a comprehensive plan in a manner primarily intended for dwellings and lies within 1,000 feet of an existing adult entertainment establishment, the adult entertainment establishment shall be considered an existing nonconforming use, as defined in Subsection (a) of this Section, from the effective date of the rezoning ordinance.

DIVISION 2. LICENSE

*Sec. 14-96.  Required;  business classifications.*

(a) It shall be unlawful for any person to operate an adult entertainment establishment without having first obtained an adult entertainment license issued by the Community Development Department which is applicable for such establishment, or to continue to operate an establishment where that person knows or has reason to know that the license of the establishment is under suspension, has been revoked or has lapsed.  The operation of an adult entertainment establishment without a valid license, where required, shall be grounds for the closing of the establishment upon a finding of fact by a court or other body with proper jurisdiction that the establishment has no valid license.

(b) Adult entertainment licenses referred to in this Article shall be classified as follows:

(1) Adult bookstore

(2) Adult theater

(3) Adult performance establishment

(c) An adult entertainment license for a particular adult entertainment establishment shall be limited to one (1) classification of license.

*Sec. 14-99. Issuance or denial.*

(a) *Generally.*

(1)     Upon the completion of the investigation and review of an application as required in this Division, upon determination that the applicant meets the requirements of this Division, and upon payment of the appropriate license fee by the applicant, the Community Development Department shall issue the license.

(2)     If, after review and investigation as provided in this Division, the Community Development Department determines that one or more of the reasons for denial stated in Subsection (b) of this Section exist, the application shall be denied, and the Community Development Depart-

ment shall make a written report of the denial and the reasons therefor.  A copy of

11

the report shall be sent by certified mail to the designated return address of the applicant on the application.

(b) *Grounds for denial.*  The application for a license shall be denied if one or more of the following conditions are found to exist:

(1)     The application does not comply with the requirements of this Article.

(2)     The application contains material false information.

(3)     The applicant or any of the individuals listed in Section 14-97(b)(1) has a license under this Division which has been suspended or revoked as a result of the implementation of Section 14-77.

(4)     The granting of the application would violate a statute or ordinance or an order from a court of law which effectively prohibits the applicant from obtaining an adult entertainment license.

(c) *Judicial review.*  Any decision of the Community Development Department pursuant to Division 2 ("License") may be immediately reviewed as a matter of right by the circuit court upon the filing of an appropriate pleading by an aggrieved party.

*Sec. 14-101. Time limit for action on application.*

The Community Development Department shall grant or deny all applications submitted hereunder within forty-five (45) days from the date that a completed application with application fee was submitted.  Upon expiration of the 45th day, the applicant shall be permitted to begin operating the establishment for which a license is sought, unless and until the Community APPENDIX—Continued
Development Department notifies the applicant of a denial of the application and states the reason(s) for that denial.

PART III. UNIFIED LAND DEVELOPMENT REGULATIONS

Chapter II

DISTRICT AND GENERAL REGULATIONS

ARTICLE VIII. NONCONFORMING USES AND NONCOMPLIANT STRUCTURES

*Section 2-8.9. Abandonment or discontinuance of a nonconforming use.*

APPENDIX—Continued

If a nonconforming use is removed or abandoned, or ceases for a continuous period of more than 90 consecutive days, any and every future use of the premises shall be in conformity with the use provisions of the land development regulations.  All material and equipment associated with the abandoned or discontinued nonconforming use shall be completely removed from the premises by its owner within six months after the expiration of the 90-day period.  No additional structure which does not conform to the requirements of this Article shall be erected in connection with such

nonconforming use of land.