CANNABIS ACTION NETWORK, INC., Kevin Aplin, Plaintiffs-Appellants-Cross-Appellees,

v.

CITY OF GAINESVILLE, Defendant-Appellee-Cross-Appellant.

Cannabis Action Network, Inc., Kevin Aplin, Plaintiffs-Appellees,

v.

City of Gainesville, Defendant-Appellant.

Nos. 99-2022, 99-2216.

United States Court of Appeals,

Eleventh Circuit.

Oct. 24, 2000.

Appeals from the United States District Court for the Northern District of Florida. (No. 95-10172-1-CV-MMP), Maurice M. Paul, Judge.

Before EDMONDSON, DUBINA and WILSON, Circuit Judges.

DUBINA, Circuit Judge:

These consolidated appeals involve facial challenges to a Gainesville, Florida, street closing ordinance and a sound ordinance. Plaintiff Cannabis Action Network's ("CAN") appeal on the merits has been consolidated with the Defendant City of Gainesville's (the "City") procedure-based appeal which argues that CAN's substantive appeal is untimely. We affirm the district court's judgment as to the procedural issue and reverse its determination of the merits.

## BACKGROUND

CAN represents a group of self-described "political activists who seek to challenge the laws of the United States and the individual states prohibiting the possession and distribution of marijuana," based on the belief that "cannabis has a variety of medicinal, industrial, and food uses which should be brought to the attention of the public." CAN regularly conducts political rallies in public parks around the country to educate the public and protest the current state of the law. Since 1989, CAN has conducted an annual rally in the Downtown Plaza in Gainesville.

On October 11, 1995, CAN applied for three permits from the City which were necessary for the annual rally: (1) an Event Permit, (2) a Street Closing Permit, and (3) a Sound Amplification Permit. The city manager denied these applications on November 3, 1995.

Soon after, Marcellina Michel-Trapaga[1] and CAN (collectively "Plaintiffs") filed a complaint in federal district court seeking declaratory and injunctive relief. Plaintiffs alleged that Section 18-17 of the Gainesville Code, which authorizes the city manager to promulgate rules for the use of the City's parks, the Street Closing Permit Ordinance, which requires a permit in order to gather in the City's parks, and the Sound Amplification Permit Ordinance, which requires a permit for the use of sound amplification, violate their First Amendment rights. The plaintiffs also claimed that the City's Special Events Policy, which had been promulgated pursuant to Section 18-17 violated their First Amendment rights. Plaintiffs amended their complaint on December 5, 1995, to add Kevin Aplin as a plaintiff. After a hearing on the preliminary injunction, the district court judge enjoined the City from enforcing its Special Event Policy finding a substantial likelihood that the policy violated the First Amendment.

The City then filed a motion for clarification to determine whether the preliminary injunction required the City to issue a Street Closing Permit and a Sound Permit along with the Event Permit. In response, the district court entered a supplemental order requiring the City to issue all three permits. As a result, CAN held its annual rally on December 9, 1995. Approximately one year later, Plaintiffs filed a second amended complaint seeking a declaratory judgment that the permit ordinances, the delegation of rule-making authority ordinance, and the Special Event Policy (as amended) were unconstitutional.

On April 24, 1997, CAN filed a motion for summary judgment asking the district court to declare the challenged ordinances and the Special Event Policy unconstitutional. In response, the City conceded that Section 23-42 of the Gainesville Code ("Street Closing Ordinance")[2] and the City's Special Event Policy, promulgated under Section 18-17, were unconstitutional, but disputed the remainder of the claims. On January 26, 1998, the district court granted CAN's motion in part, declaring the *original* version of the Street Closing Ordinance unconstitutional and reaffirming the preliminary injunction which held the Special Event Policy unconstitutional. The district court also ruled, in pertinent part, that the *amended* version of the Street Closing Ordinance was facially constitutional and that Section 15-4 of the Gainesville Code ("Sound

---

[1]Ms. Michel-Trapanga has since settled her suit with the city and is not a party to these appeals. CAN and Kevin Aplin, who was added as a plaintiff after the filing of the original complaint, filed the present substantive appeal.

[2]The City subsequently amended the Street Closing Ordinance, and Plaintiffs challenged the amended ordinance.

Ordinance") was not susceptible to a facial challenge.[3]

On June 3, 1998, the district court entered a Final Judgment in favor of CAN and the various individual plaintiffs on the facial unconstitutionality of the original version of the Street Closing Ordinance. However, the written judgment failed to mention that the district court had affirmed the enforceability of both the Sound Ordinance and the revised version of the Street Closing Ordinance. On June 10, 1998, the City filed a timely motion to amend the Final Judgment to accurately reflect the court's January 26, 1998, Partial Summary Judgment Order. On the same day, not realizing that the City had a motion pending relating to the judgment rendered against CAN, CAN and Aplin filed their notices of appeal.[4] As a result of the City's pending motion, the district court dismissed CAN's appeal as untimely.

In response to the City's motion, CAN agreed that the Final Judgment should be amended and further argued that, although the individual plaintiffs did not join the April 24, 1997, motion for summary judgment, the district court could grant a judgment in their favor, as to the Street Closing Ordinance and the Event Policy, because when a court finds an ordinance to be facially unconstitutional upon the challenge of any one party, the ordinance is necessarily unconstitutional as to all others. On September 9, 1998, the district court granted the City's motion to amend the judgment, but declined to grant summary judgment in favor of the individual plaintiffs. Instead, the district court directed the City to show cause why it should not grant summary judgment in favor of the individual plaintiffs. The clerk's office was delinquent in entering the amended judgment[5] directed by the court's September 9 order. Believing that the case was still active as to both CAN and the individual plaintiffs, CAN failed to renew its notice of appeal after the September 9 order.

After reviewing the memoranda filed regarding the status of the individual plaintiffs' claims, the district court entered an order dated November 17, 1998, granting summary judgment in favor of the remaining defendants and ruling that the amended Street Closing Ordinance was constitutional. However, the order failed to address the constitutionality of the Sound Ordinance and the Event Policy which had also

---

[3]The district court rejected Plaintiffs' challenge to Section 18-17, the delegation of rule-making authority to the city manager. This ordinance will not be discussed in this appeal because Plaintiffs abandoned their challenge to this ordinance.

[4]The city originally filed a cross appeal to CAN and Aplin's substantive appeal, but the city subsequently abandoned the cross appeal.

[5]As of at least, December 10, 1998, the clerk's office had not entered the September 9 amended judgment. *See* Doc. 117 at 2.

been challenged by the individual plaintiffs. Because of this omission, the individual plaintiffs moved for clarification of the order, which the district court ultimately granted, in conjunction with its finding that the individual plaintiffs were entitled to summary judgment on the issues involving the Gainesville Ordinances § 18-17, § 15-14, and the amended version of § 23-42. *See* Doc. 217 at 6.

In October of 1998, CAN filed a motion to extend the time for filing a notice of appeal under Federal Rule of Appellate Procedure 4(a)(5) ("Rule 4(a)(5)"). Identifying the history of the proceedings as "convoluted," and finding that CAN's failure to file a timely notice of appeal was "excusable neglect," the district court granted the motion to extend time. Accordingly, CAN was permitted to file a notice of appeal out of time and to join Kevin Aplin's timely appeal. The City now appeals the district court's grant of an extension of time to CAN to file its notice of appeal. As previously noted, the City's procedure-based appeal has been consolidated with CAN and Kevin Aplin's appeal on the merits.[6]

There are three issues before us on appeal. As a preliminary matter, we must decide whether the district court abused its discretion in extending CAN's time to file a notice of appeal. If we find that CAN's appeal is properly before us, we must then determine whether Gainesville's Sound Ordinance (§ 15-4) and Street Closing Ordinance (§ 23-42) are unconstitutional prior restraints on free speech because they fail to include each procedural safeguard outlined in *Freedman v. Maryland,* 380 U.S. 51, 85 S.Ct. 734, 13 L.Ed.2d 649 (1965).[7]

---

[6]The proceedings from that point took a separate track with respect to the remaining Plaintiffs. On May 3, 1999, the City filed a motion to amend the judgment entered in favor of CAN which struck down the original version of the Street Closing Ordinance. The district court entered an order stating that it would be inclined to identify those issues on which CAN failed to prevail if the case were remanded by this court for that purpose. Soon after, the City filed a motion for remand with this court. We granted that motion and remanded the case for the limited purpose of correcting "certain clerical errors in the final judgment." *See* Order 99-2022, Nov. 18, 1999.

[7]Although the permit ordinance discussed in *Coalition for the Abolition of Marijuana Prohibition (CAMP) v. City of Atlanta,* 219 F.3d 1301 (11th Cir.2000) is similar to the permit ordinances before us in this case, CAMP's challenge to the "time, place and manner" restrictions contained in the Atlanta ordinance is distinct from CAN's *Freedman*-based challenge to Gainesville's ordinances. In their original suit, the *CAMP* plaintiffs did bring a *Freedman*-based challenge to the Atlanta Outdoor Festival Ordinance 1994, Atlanta City Code § 138-208, and indeed, the district court held that the procedural safeguards contained therein were inadequate. *See id.* at 1308.

The City of Atlanta subsequently amended the procedural safeguards portion of the Festival Ordinance. The new version of Atlanta City Code § 138-207 provides that an applicant shall receive notice of a permit denial "no later than 30 days prior to the proposed date of the event." Sections 138-207 and 138-208 further provide for a *de novo* administrative appeal to the Mayor within 10 days of the denial. Finally, Section 138-208 provides that a denial by the Mayor:

STANDARDS OF REVIEW

We review a district court's grant of an extension of time under Rule 4(a)(5) for abuse of discretion. *See Advanced Estimating System, Inc. v. Riney,* 130 F.3d 996, 997 (11th Cir.1997). We review grants of summary judgment de novo, applying the same legal standards as the district court. *See Cutcliffe v. Cochran,* 117 F.3d 1353, 1355 (11th Cir.1997).

DISCUSSION

A.      Rule 4(a)(5)

The City appeals the district court's grant of an extension of time to CAN to file its notice of appeal. CAN concedes that its first notice of appeal was untimely. However, CAN argues that the district court's extension was proper under Rule 4(a)(5) of the Federal Rules of Appellate Procedure ("Rule 4(a)(5)"), which provides that a district court, upon a showing of excusable neglect or good cause, may extend the time for filing a notice of appeal. CAN argues that the district court properly granted the extension of time because of the substantial ambiguities in the post-judgment proceedings at the district level. The City counters that CAN's argument relies on a lack of awareness and on a misunderstanding of the law, both of which do not support a finding of excusable neglect.

The Committee Notes for Rule 4(a)(5) clarify that a motion for an extension of time which is filed before expiration of the original 30-day period is evaluated under the "good cause" standard, whereas a motion for an extension of time filed after the expiration of the original 30-day period is evaluated under the "excusable neglect" standard. *See* Fed. R.App. P. 4(a)(5) advisory committee's notes; *accord Advanced Estimating System, Inc. v. Riney,* 77 F.3d 1322, 1323 (11th Cir.1996). Thus, in this case, because CAN filed its motion outside of the original 30-day period, we must apply the excusable neglect standard.

When applying the excusable neglect standard in the context of the Federal Rules of Appellate Procedure, this court adheres to the standard originally set forth in *Pioneer Investment Services Co. v.*

---

shall be the final decision of the City in the matter, and shall be subject to review by the Superior Court of Fulton County by a petition setting forth an appeal and naming the City of Atlanta as the defending party. The City shall expedite its response to such petition so as to allow the provision of judicial determination of the matter no later than ten (10) days prior to the date of the festival.

The *CAMP* plaintiffs did not renew their *Freedman*-based challenge with regard to the amended version of the ordinance. *See id.* Accordingly, this court never considered the constitutionality of the procedural safeguards contained in either the 1994 or the 2000 version of the Atlanta Festival Ordinance.

*Brunswick Associates Ltd. Partnership,* 507 U.S. 380, 113 S.Ct. 1489, 123 L.Ed.2d 74 (1993). *See Advanced Estimating Sys.,* 77 F.3d at 1324. *Pioneer's* excusable neglect standard mandates that:

> courts should "tak[e] account of all relevant circumstances surrounding the party's omission," including "the danger of prejudice to the [nonmovant], the length of the delay and its potential impact on judicial proceedings, the reason for the delay, including whether it was within the reasonable control of the movant, and whether the movant acted in good faith."

77 F.3d at 1325 (quoting, *Pioneer,* 507 U.S. at 395, 113 S.Ct. at 1498).

An examination of the four *Pioneer* factors reveals that the district court in this case did not abuse its discretion. First, the City has not been prejudiced by CAN's tardiness because the City knew from CAN's premature filing of its notice of appeal that CAN intended to appeal. Furthermore, because Kevin Aplin's notice of appeal was timely, this court would hear the constitutional issues arising out of the case and the City would be forced to defend the same even if CAN was not permitted to participate. Second, the effect on the judicial process resulting from CAN's tardiness in filing its notice of appeal is *de minimus,* particularly in light of the many years these parties have been involved in this litigation. *See City of Chanute v. Williams Natural Gas Co.,* 31 F.3d 1041, 1046-47 (10th Cir.1994) (noting that a 31-day delay was "a very short time" in the context of a "protracted litigation battle"). In fact, CAN's late notice has had no effect on this court's review of the merits of the case because this court must decide the same questions as presented in the timely appeal of CAN's co-Plaintiff, Kevin Aplin.

Third, CAN has a legitimate reason for its delay in filing its notice. As highlighted by the district court, the post-judgment history of this case has been confusing. Originally, CAN attempted to file its notice of appeal on June 3, 1998, but because the City filed a motion to amend, this initial notice was rendered premature, and therefore, ineffective. The district court's September 9, 1998, ruling on the City's motion to amend included language which required the City to "show cause ... why summary judgment should not also be awarded against the remaining plaintiffs." *See* Doc. 205 at 3. Based on the district court's express reservation to consider additional relief, CAN developed the good faith belief that the district court's September 9 order did not completely dispose of the pending Rule 59 motion. That belief was incorrect because the district court's order reserved judgment only with regard to the individual plaintiffs and did not affect the finality of the judgment against CAN.[8]

The district court found it "understandable that CAN thought that the court considered that question

---

[8]CAN argues that its mistake did not become apparent until after its 30-day period for filing its notice of appeal had expired.

(whether the court should grant summary judgment to the individual plaintiffs) to be part and parcel of the motion to amend the judgment." *See* Doc. 217 at 6. The district court goes on to explain that CAN's erroneous view was also subscribed to by the clerk's office, which failed to enter the amended judgment against CAN, "probably also believing that the order of September 9, 1998, did not fully intend to dispose of the pending motion to amend."[9] *See* Doc. 217 at 6. Accordingly, CAN's tardiness results from circumstances which were beyond its reasonable control and not from mere lack of awareness or misunderstanding of the law. *See Advanced Estimating System, Inc.,* 130 F.3d at 998. Finally, as noted by the district court, CAN has been diligent and unwavering in its attempt to pursue an appeal. There is no indication that CAN's delay resulted from mere negligence or bad faith.

Unlike *Advanced Estimating System,* this case concerns a mistake of fact, not law: CAN was mistaken as to whether the September 9 ruling was a final judgment. In context, the mistake is understandable. This is not a case where an attorney simply misunderstood the rules. To the contrary, the orders of the district court were unclear, making it difficult for CAN to apply the rules of procedure. After a careful analysis, the district court determined that CAN's attorneys had good reason to misconstrue the ambiguous situation. This court is not invited to reevaluate the district court's finding of excusable neglect. What matters is that the district court applied the correct law, and its conclusion does not constitute an abuse of discretion. Accordingly, we affirm the district court's grant of an extension of time for CAN to file its notice of appeal under Fed. R.App. P. 4(a)(5) and hold that we have jurisdiction over CAN's substantive appeal.

B.      Substantive Appeal

This case involves First Amendment protected speech in "the archetype of a traditional public forum." *Frisby v. Schultz,* 487 U.S. 474, 480, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988). The two challenged ordinances do not completely suppress all First Amendment activity, but they sharply confine the scope of the speech activity by effectively limiting the number of people who can listen and participate. Accordingly, we must first determine, with respect to the Sound Ordinance, if the restriction on the use of amplified sound

---

[9]The confusing nature of this case continued after the September 9 order. For example, when Summary Judgment was ultimately entered in favor of the individual Plaintiffs on November 17, 1998, the Order did not specify those issues on which the Plaintiffs failed to prevail. Accordingly, the post-judgment fog did not begin to clear until issuance of the December 8, 1998, order. Moreover, the confusion still persists on some fronts, illustrated by the fact that this court has had to remand the case to the district court to correct another technical error in the language. *See* Order, Filed Nov. 18, 1999.

constitutes a prior restraint on speech. We need not determine if the Street Closing Ordinance is a prior restraint because both parties, as well as the district court, properly agree that it is. Second, we will examine both ordinances to determine if they contain the procedural safeguards required of prior restraints on speech.

1.      Prior Restraint

The Supreme Court has held that any statute or ordinance which vests local officials with discretionary power to issue a permit that is required as a prerequisite to the use of public places for First Amendment activities is a prior restraint on speech. *See Kunz v. New York,* 340 U.S. 290, 293-94, 71 S.Ct. 312, 314-15, 95 L.Ed. 280 (1951). A prior restraint, unlike other restrictions on speech, is subject to a facial challenge. *See Ward v. Rock Against Racism,* 491 U.S. 781, 793, 109 S.Ct. 2746, 2755, 105 L.Ed.2d 661 (1989) ("Our cases permitting facial challenges to regulations that allegedly grant officials unconstrained authority to regulate speech have generally involved licensing schemes that 'vest[ ] unbridled discretion in a government official over whether to permit or deny expressive activity.' ") (quoting *Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 755, 108 S.Ct. 2138, 2143, 100 L.Ed.2d 771 (1988)). Facial challenges are permitted on the rationale that when a prior restraint allegedly contains a risk of delay or arbitrary censorship, "every application of the statute create[s] an impermissible risk of suppression of ideas." *United States v. Frandsen,* 212 F.3d 1231, 1236 (11th Cir.2000) (quoting *Nightclubs, Inc. v. City of Paducah,* 202 F.3d 884, 889 (6th Cir.2000)).

CAN brings a facial challenge to the constitutionality of Section 15-4 of the Gainesville Code, the Sound Ordinance. Section 15-4 vests the city manager with the discretion to exempt special events from the general prohibition on the use of amplified sound contained in Section 15-3.[10] The exception in Section 15-4, entitled "Special Permits" reads:

> Applications for a special permit for relief from the maximum sound level limits designated in this chapter ... may be made in writing to the city manager or designee, or his/her duly authorized representative. Any permit granted by the city manager or designee hereunder must be in writing and

---

[10]Section 15-3 provides:

> (a) *General Prohibition.* It shall be unlawful and a violation of this chapter to make, cause or allow the making of any sound that exceeds the limits set forth in this chapter, causes a noise disturbance, or is plainly audible as defined in section 15-2 ...

(3)      *Radios, televisions, electronic audio equipment, musical instruments or similar devices.* No person shall operate, play, or permit the operation of any ... sound amplifier that produces, reproduces or amplifies sound in such a manner as to create a noise disturbance or be plainly audible across a real property boundary. However this subsection shall not apply to any use or activity for which a special permit has been issued pursuant to section 15-4.

shall contain all conditions upon which the permit shall be effective. The city manager or designee, or his/her duly authorized representative, is authorized to grant the relief as applied for under the following conditions:

(1)     *Authority to prescribe special requirements.* The city manager or designee may prescribe any reasonable conditions or requirements he/she deems necessary to minimize noise disturbances upon the community or surrounding neighborhood, including use of mufflers, screen or other sound-attenuating devices.

               ...

(3)     *Other Permits.* Special permits for nonentertainment special purposes, other than for emergency work ... may be issued under the following conditions:

               ...

(c)     The special permit may be issued only for hours between 7:00 a.m. and 11:00 p.m. the same day on week days, and

(d)     Special permits may be issued for no longer than one week....

Gainesville Code § 15-4. The district court found that the Sound Ordinance was not subject to a facial challenge because "in their challenge to § 15-4, the plaintiffs do not suggest that city officials enjoy unfettered discretion to deny speech altogether, just that the city could refuse to allow amplification of sound."[11] The district court distinguished the Sound Ordinance from other kinds of restraints on the grounds that the Ordinance does not flatly deny the speaker the right to speak in public. Rather, the Sound Ordinance denies the speaker the right to amplify his speech so that it may be heard by many others.

In support of its finding, the district court cites *Ward v. Rock Against Racism* for the proposition that a sound regulation whose goals are to "insure appropriate sound quality balanced with respect for nearby residential neighbors" is not a prior restraint on speech. *See* Doc. 146 at 18 (quoting *Ward,* 491 U.S. at 794, 109 S.Ct. at 2755). The district court's reliance on *Ward,* however, fails to recognize a fundamental difference between this case and *Ward:* the *Ward* Court never confronted an outright denial of sound amplification. To the contrary, *Ward* turned on the issue of who had the right to control the mix and level of the amplified sound.[12] *See* 491 U.S. at 792, 109 S.Ct at 2754. Moreover, despite offering dicta which

_____

[11]As a factual matter, it is without question that CAN's complaint alleges that the city manager has "complete and unfettered discretion" to grant or deny permits for political rallies.

[12]Rock Against Racism objected to the city's control over the mix and level of sound because, in its view, "the city [was] seeking to assert *artistic control* over performers at the bandshell by enforcing a bureaucratically determined, value-laden concept of good sound." 491 U.S. at 792, 109 S.Ct. at 2754 (emphasis added). Thus, Rock Against Racism's argument turned on the notion that the sound was an integral part of the content, reasoning that control over sound equals control over content. The Supreme Court rejected that rationale.

questioned the propriety of a facial challenge to a sound amplification ordinance, the *Ward* Court ultimately decided the case on the merits of the facial challenge. *See id.* at 794, 109 S.Ct. at 2755 ("We need not decide, however, whether the 'extraordinary doctrine' that permits facial challenges to some regulations of expression should be extended to the circumstances of this case, for respondent's facial challenge fails on its merits.") (internal citation omitted). Thus, the Supreme Court did not determine that a facial challenge was inappropriate. Instead, the Court held that vesting the right to control sound amplification in the hands of the government did not amount to a prior restraint on speech. *See id.*

This case is distinct from *Ward* because it involves not merely the right to limit and control noise level and mix of sound, but the ability of the government, here the City of Gainesville, to deny the use of sound amplification equipment *in toto:*

> The grant of discretion that respondent seeks to challenge here is of an entirely different, and lesser, order of magnitude [than other facial challenge cases], because respondent does not suggest that city officials enjoy unfettered discretion to deny bandshell permits altogether. Rather, respondent contends only that the city, by exercising what is concededly its right to regulate amplified sound, could choose to provide inadequate sound for performers based on the content of their speech. Since respondent does not claim that city officials enjoy unguided discretion to deny the right to speak altogether, it is open to question whether respondent's claim falls within the narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory authority.

*Id.* at 793-94, 109 S.Ct. at 2755. In the present case, CAN does, in fact, claim that city officials enjoy unbridled discretion to deny use of *all* amplification equipment and that this discretion can effectively ban speech itself. In this sense, Gainesville's ordinance appears to "authorize[ ] suppression of speech in advance of its expression," through a general ban on the use of sound amplification equipment unless a special permit is obtained. *Id.* at 795 n. 5, 109 S.Ct. at 2756 n. 5 ("The relevant question [in determining the presence of a prior restraint] is whether the challenged regulation authorizes the suppression of speech in advance of its expression ...").

Though decided long before *Ward* and even before *Freedman,* the Supreme Court's opinion in *Saia v. New York,* 334 U.S. 558, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948), is closely analogous to this case.[13] The ordinance in *Saia* forbade the use of all sound amplification devices except with the permission of the Chief of Police.[14] *See* 334 U.S. at 558, 68 S.Ct. at 1149. The challenge to the statute came from a Jehovah's

---

[13]Though not mentioned in *Ward, Saia* has been regularly cited with approval, most recently in *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, 226, 110 S.Ct. 596, 605, 107 L.Ed.2d 603 (1990).

[14]The ordinance provided in pertinent part:

> Section 2. Radio devices, etc.—It shall be unlawful for any person to maintain and

Witness, Saia, who obtained permission from the Chief of Police to use sound equipment, mounted atop his car, to amplify lectures on religious subjects given in a public park on Sundays. *See id.* at 559, 68 S.Ct. at 1149. Upon expiration of his first permit, the Chief of Police denied Saia a second permit. *See id.* Saia appealed and the Supreme Court held:

> [Section] 3 of this ordinance is unconstitutional on its face, for it establishes a previous restraint on the right of free speech in violation of the First Amendment which is protected by the Fourteenth Amendment against State action. To use a loud-speaker or amplifier one has to get a permit from the Chief of Police. There are no standards prescribed for the exercise of his discretion. The statute is not narrowly drawn to regulate the hours or places of use of loud-speakers, or the volume of sound (the decibels) to which they must be adjusted.

334 U.S. at 559-60, 68 S.Ct at 1149. The Supreme Court likened the sound ordinance to other ordinances previously struck down as prior restraints on speech, such as a license requirement to distribute religious material, a license requirement to distribute literature, and a license requirement for public assembly in public parks or in the streets because all four had the same defect the right to be heard is placed in the uncontrolled discretion of the Chief of Police. *See id.* (citing *Cantwell v. Connecticut,* 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940); *Lovell v. Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938); and *Hague v. C.I.O.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939)).

The *Saia* Court stated emphatically that "[l]oud-speakers are today indispensable instruments of effective public speech." 334 U.S. at 561, 68 S.Ct. at 1150. Treating a licensing requirement for the use of sound amplification as a prior restraint, the Court held that noise can be regulated through narrowly drawn statutes which limit decibel levels and/or the hours and place of public discussion, but insisted that "[w]hen a city allows an official to ban [loud speakers] in his uncontrolled discretion, it sanctions a device for suppression of free communication of ideas." *Id.* at 562, 68 S.Ct. at 1150-51. Moreover, the Court expressly rejected nuisance or annoyance as a justification for restricting free speech through a denial of sound

---

> operate in any building, or on any premises or on any automobile, motor truck or other motor vehicle, any radio device, mechanical device, or loud speaker or any device of any kind whereby the sound therefrom is cast directly upon the streets and public places and where such device is maintained for advertising purposes or for the purpose of attracting the attention of the passing public, or which is so placed and operated that the sounds coming therefrom can be heard to the annoyance or inconvenience of travelers upon any street or public places or of persons in neighboring premises.

> Section 3. Exception.—Public dissemination, through radio, loudspeakers, of items of news and matters of public concern and athletic activities shall not be deemed a violation of this section provided that the same be done under permission obtained from the Chief of Police.

334 U.S. at 558 n.1, 68 S.Ct. at 1149.

amplification. *See id.* at 561-62, 68 S.Ct. at 1150-51. Accordingly, we conclude that the district court erred in this case when it found that the Sound Ordinance is not subject to facial challenge. The Sound Ordinance is a prior restraint on speech and as such, must meet the procedural safeguards set forth in the *Freedman* line of cases. *See FW/PBS,* 493 U.S. at 225-26, 110 S.Ct. at 605; *Freedman,* 380 U.S. at 58-59, 85 S.Ct. at 739.

2.      Procedural Safeguards

In *Freedman v. Maryland,* the Supreme Court enumerated certain constitutional concerns and the corresponding procedural safeguards necessary to ensure the protection of the First Amendment speech rights when faced with a system of prior restraints. Cases dealing with prior restraints have identified two evils which must be guarded against. *See , FW/PBS,* 493 U.S. at 225-26, 110 S.Ct. at 604-05; 380 U.S. at 57-58, 85 S.Ct. at 738. First, a scheme that places unbridled discretion in the hands of a government official or agency threatens unconstitutional censorship. *See FW/PBS,* 493 U.S. at 225-26, 110 S.Ct. at 604-05. Second, a prior restraint that fails to place limits on the time within which the decision-maker must issue the license creates the possibility that constitutionally protected speech will be suppressed. *See id.* at 226, 110 S.Ct. at 605. *Freedman* sets forth three procedural safeguards: (1) upon denial of the right to speak, the censor must bear the burden of initiating judicial proceedings, as well as the burden of proof once in court; (2) any restraint prior to judicial review can be imposed only for a specified and brief time period during which the status quo is maintained; and (3) there must be the assurance of prompt judicial review in the event that the speech is erroneously denied. 380 U.S. at 58-59, 85 S.Ct. at 739. In *FW/PBS,* a majority of the Court agreed that, at the very least, the latter two of these safeguards are "essential," while a three judge plurality held that the first procedural safeguard may not be required in certain limited circumstances. *See* 493 U.S. at 229-30, 110 S.Ct. at 606-07; *see also, Ward v. County of Orange,* 217 F.3d 1350 (11th Cir.2000) ("[T]he [FW/PBS] plurality concluded a [business] licensing scheme must provide the second and third safeguards required by *Freedman.*"); *Redner v. Dean,* 29 F.3d 1495, 1500 (11th Cir.1994) ("In *FW/PBS,* therefore, six Justices agreed that a [business] licensing ordinance, such as the one in question here, must contain, at a minimum, the latter two procedural safeguards from *Freedman:* specified brief time limits on the decisionmaker and prompt judicial review."). Having determined that both the Sound Ordinance and the Street Closing Ordinance are prior restraints on speech, we must evaluate each ordinance for the presence of at least two, if not all three, of the *Freedman* procedural safeguards.

a.      Sound Ordinance

Examining the Sound Ordinance for compliance with *Freedman*'s procedural safeguards, we need not look closely at whether the ordinance meets the first and third safeguards, because the ordinance plainly fails to meet the requirements of the second safeguard. The second *Freedman* requirement "that any restraint prior to a judicial determination may only be for a specified brief period of time in order to preserve the status quo means that 'the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained.' " *Frandsen,* 212 F.3d at 1239 (quoting *FW/PBS,* 493 U.S. at 228, 110 S.Ct. at 606). Even a cursory examination of the City's Sound Ordinance reveals that it does not specify any time within which the city manager must issue or deny a Sound Amplification Permit. Furthermore, the ordinance does not obligate the city manager to make a decision at all, nor does it require the manager to notify the applicant of the decision. Thus, as was the case in *FW/PBS,* the ordinance leaves open the possibility of "indefinite postponement of the issuance of a license." 493 U.S. at 227, 110 S.Ct. at 606. Lacking this essential procedural safeguard, the Sound Ordinance can not withstand a facial challenge. Accordingly, the district court's grant of summary judgment in favor of the City as to the Sound Ordinance must be reversed.[15]

b.      Street Closing Ordinance

Unlike the Sound Ordinance, examination of the Street Closing Ordinance requires us to evaluate the two "essential" procedural safeguards and to determine whether the remaining procedural safeguard should be required in this instance. Although the City has amended the Street Closing Ordinance since CAN first brought this challenge,[16] CAN insists that the new ordinance still stops short of meeting the first and third

---

[15]We note additionally that the Sound Ordinance does not set forth any standards to govern the basis upon which the city manager should issue or deny a permit. The manager is authorized, but not required, to issue sound amplification permits. There are no guidelines or standards to limit his decision-making discretion. The ordinance says only that the goal of the manager's decision is "to minimize noise disturbances upon the community or surrounding neighborhood." In this sense, the ordinance approaches a censorship scheme, as it appears to provide the city manager with unbridled discretion to issue or deny a permit.

[16]At the outset of this case, the City conceded that the original version of the Street Closing Ordinance, Section 23-42, was subject to facial challenge and that it was unconstitutional in its original form. The City has since amended the ordinance, and in doing so, corrected some of the original constitutional infirmities. For example, the new ordinance requires final action by the city manager within five days of submission of an application and under appropriate circumstances, that time may be shortened to two days. Accordingly, CAN no longer asserts a challenge to the time-limit aspect of the ordinance.

*Freedman* procedural safeguards.[17]  CAN concedes that Section 23-42 satisfies the second procedural safeguards listed in *Freedman* and identified as "essential" in *FW/PBS,* because the ordinance requires a decision by the city manager within a brief, specified period of time.

The other "essential" procedural safeguard identified by the *FW/PBS* plurality is the guarantee of "prompt judicial review."  *See FW/PBS,* 493 U.S. at 228, 110 S.Ct. at 606.  The Supreme Court has not explained exactly what it meant by "prompt judicial determination" in *Freedman,* nor what it meant by "prompt judicial review" in *FW/PBS.*[18]  Consequently, there is great confusion and disagreement among the

---

[17]Currently, § 23-42 provides in pertinent part:

> (a) *Permit Required.*  It shall be unlawful for persons to assemble or congregate in crowds in such numbers as to block the use of any sidewalk or street of the city without a permit from the city manager or designee, issued pursuant to this section
>
> ...
>
> (c) *Granting or denial of permit.*

(1) *Granting of permit;  time;  considerations.*  The city manager or designee shall grant the requested permit within five business days of receipt of the application ... if the event or activity for which it is requested:

a. Will not unreasonably interfere with the flow of vehicular or pedestrian traffic, such as when alternative routes for such traffic are unavailable or impractical;

b. Will not unreasonably deny access to any properties or areas of the city by either vehicular or pedestrian traffic;

c. Will not cause imminent danger or health hazard to any person and will not damage any public or private property;  and

d. Will not create an unreasonable demand upon the city's emergency services personnel and equipment, so as to cause potential deficiencies in such services.

> ...

(2) If the city manager or designee finds the planned event or activity violates any of the above conditions, he or she shall inform the applicant that the permit will not be granted and request the city attorney apply to the circuit court for Alachua County for an order enjoining the applicant and other interested persons from conducting the planned event or activity.

Gainesville Code Sec. 23-42.

[18]The Supreme Court has indicated that a prior restraint, if it is to meet *Freedman'* s requirements, must provide specifically for judicial review of administrative decisions to limit speech. *See Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 561-62, 95 S.Ct. 1239, 1248, 43 L.Ed.2d 448 (1975).  The scheme held to be inadequate judicial review in *Southeastern* consisted of non-statutory judicial access to the courts when a constitutional violation has been alleged.  In *Southeastern,* the city rejected an application to use its auditorium. *See id.* at 561, 95 S.Ct. at 1248.  Within a few days of the denial, a federal district court held hearings on a motion for preliminary injunction. *See id.*  At that time, the court denied the preliminary injunction but, five months later, conducted a full hearing on the merits of the

federal Courts of Appeal regarding what exactly *Freedman* and its progeny require to fulfill *Freedman's* third procedural safeguard.[19] This circuit officially weighed-in on a portion of the circuit split when we determined that *Freedman* and its progeny require only prompt judicial *access* where the ordinance was a business licensing scheme. *See Boss Capital, Inc. v. City of Casselberry,* 187 F.3d 1251, 1256-57 (11th Cir.1999). Importantly, we limited ourselves in *Boss Capital* to the specific facts before us and declined to answer the unposed question of whether *Freedman'* s requirement of "prompt judicial review" demanded explicit provision for prompt judicial determination in challenges not involving business licensing schemes. *See id.* at 1256-57. For the reasons explained below, we need not answer that difficult question today.

As to *Freedman'* s remaining procedural safeguard, CAN argues that the Street Closing Ordinance fails to require the City to initiate judicial proceedings. The City counters, arguing that *FW/PBS* provides for an exception to the *Freedman* requirement that the censor bear the burden of going to court and the burden of proof once in court. The *FW/PBS* plurality created a specific exception to this procedural safeguard for business licensing schemes. *See* 493 U.S. at 229-30, 110 S.Ct. at 606-07. This exception derives from two rationales. First, under a licensing scheme, the licensor merely "reviews the general qualifications of each license applicant, a ministerial action that is not presumptively invalid," and does not "exercise discretion by passing judgment on the content of any protected speech." *Id.* at 229, 110 S.Ct. at 607. Second, a licensing scheme creates different financial incentives and puts "much more at stake" for the applicant than a censorship scheme: "Because the license is the key to the applicant's obtaining and maintaining a business,

---

action for injunction. *See id.* Nevertheless, the Supreme Court held that the procedural safeguards were lacking because "[t]he board's system did not provide a procedure for prompt judicial review." *Id.* Some courts have considered the holding in *Southeastern* to be a requirement that the statute, regulation or ordinance explicitly provide for prompt judicial review of the decision to suppress expressive activity. *See Redner,* 29 F.3d at 1502 n. 9. Yet, other courts have since distinguished *Southeastern* on its facts to hold that non-statutory judicial access, usually access through a state's common law writ of certiorari, is sufficient. *See id.*

[19]Much of the confusion flows from the Supreme Court's plurality opinion in *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990):

> Justice O'Connor's plurality opinion in that case says that "there must be the possibility of prompt judicial review in the event that [a] license is erroneously denied." *See id.* at 228, 110 S.Ct. 596. Later she says that the Dallas ordinance violates the First Amendment because "[i]t also fails to provide an avenue for prompt judicial review ..." *Id.* at 228, 110 S.Ct. 596. In concurrence, Justice Brennan does not explicitly disagree with the plurality opinion on this issue, but he characterizes the right to prompt judicial review differently, referring to it as the right to "a prompt judicial determination." *Id.* at 239, 110 S.Ct. 596 (Brennan, J. concurring) (citing *Freedman,* 380 U.S. at 58-59, 85 S.Ct. 734).

*Boss Capital,* 187 F.3d 1251, 1255 (11th Cir.1999) (citations amended or omitted).

there is every incentive for the applicant to pursue a license denial through court." *Id.* at 229-30, 110 S.Ct. at 607. Relying on both of these differences, the *FW/PBS* plurality shifted the burden of going to court, as well as the burden of proof once in court, to the petitioner where the regulatory scheme is a business licensing scheme. *See id; see also Ward v. County of Orange,* 217 F.3d at 1354 ("Once again, it is important to stress the differences between censorship schemes, and [business] licensing schemes'[t]he dangers of censorship are less threatening when it comes to [business] licensing schemes.") (quoting *Boss Capital,* 187 F.3d at 1256).

Careful analysis reveals that the regulation in this case displays aspects of both a censorship scheme and a licensing scheme as defined by the Supreme Court, and as a result, the regulation does not fall neatly into either category. Like the schemes in *FW/PBS* and *Boss Capital,* the City's permit scheme is content neutral. However, up to this point, all of the licensing scheme cases, including *FW/PBS, Boss Capital,* and *Ward v. County of Orange,* involved business licenses. In contrast, this case involves a non-profit, public interest group seeking a one-time permit to engage in non-profit, political activities, rather than a commercial enterprise seeking a license to engage in for-profit, continuous commercial activities. Accordingly, this case lacks the second distinguishing characteristic of a business licensing scheme—CAN has no financial incentive to challenge the City's denial of a Street Closing Permit. In this sense, the permit sought by CAN is sharply distinct from the business licenses examined in *FW/PBS, Boss Capital* and *Ward v. County of Orange.*[20]

Finding that this case does not fall into either of the categories heretofore delineated by the Supreme Court, we return to the original language in *Freedman* and in the Supreme Court's subsequent opinions to better understand the rationale behind this burden-shifting procedural safeguard. The *Freedman* court expressed its concern that without all three procedural safeguards:

> it may prove too burdensome to seek review of the censor's determination. Particularly in the case of motion pictures, it may take very little to deter exhibition in a given locality. The exhibitor's stake

---

[20]We recognize that it would be splitting hairs to try to base our distinction between the statutes on the use of the word "license" versus the use of the word "permit," as those words are often used interchangeably. *See e.g.,Forsyth County, Georgia v. Nationalist Movement,* 505 U.S. 123, 130-31, 112 S.Ct. 2395, 2401, 120 L.Ed.2d 101 (1992) (describing a challenge to a "permit fee" and applying the law that the "licensing authority" must be guided by "narrow, objective, and definite standards"); *Shuttlesworth,* 394 U.S. at 151, 89 S.Ct. at 935 ("an ordinance which, like this one, makes the peaceful enjoyment of freedoms ... contingent upon the uncontrolled will of an official-as by requiring a *permit* or *license* which may be granted or withheld in the discretion of such official-is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms") (quoting *Staub v. City of Baxley,* 355 U.S. 313, 322, 78 S.Ct. 277, 282, 2 L.Ed.2d 302 (1958)) (emphasis added). Thus, our distinction, in this instance, rests not on the semantics of a given statute, but on the inherent differences between the facts of this case and cases involving business licensing statutes such as those in *FW/PBS* and *Boss Capital.*

in any one picture may be insufficient to warrant a protracted and onerous course of litigation. 380 U.S. at 59, 85 S.Ct. at 739. In *FW/PBS,* although distinguishing *Freedman,* the Court again recognized that absent a requirement that the censor bear the burden of going into court and the burden of proof, the party seeking to speak was "likely to be deterred from challenging the decision to suppress the speech, and therefore, the censor's decision to suppress was tantamount to complete suppression of the speech." 493 U.S. at 229, 110 S.Ct. at 607.

The power of deterrence identified in those two cases is even greater in this case, where the permit being sought is not a business license. To the contrary, the permit here is basically a parade permit; it is a permit which the speakers must obtain before they can make use of a quintessential public forum to engage in core political speech. *See R.A.V. v. City of St. Paul, Minnesota,* 505 U.S. 377, 422, 112 S.Ct. 2538, 2564, 120 L.Ed.2d 305 (1992) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position; commercial speech and nonobscene, sexually explicit speech are regarded as a sort of second-class expression; obscenity and fighting words receive the least protection of all.") (Stevens, White and Blackmun, JJ. concurring); *Burson v. Freeman,* 504 U.S. 191, 196, 112 S.Ct. 1846, 1850, 119 L.Ed.2d 5 (1992) ("[Q]uintessential public forums ... include those places 'which by long tradition or by government fiat have been devoted to assembly and debate,' such as parks, streets, and sidewalks.") (quoting *Perry Education Assn. v. Perry Local Educators Assn.,* 460 U.S. 37, 45, 103 S.Ct. 948, 955, 74 L.Ed.2d 794 (1983)). Because the Street Closing Permit is not a business permit, most speakers in CAN's position lack financial incentive to challenge the City's Street Closing Ordinance and are likely to be heavily deterred from initiating litigation.

Moreover, the argument for relaxing the procedural safeguards is not as strong in this case as it was in *FW/PBS.* As we recognized in *Boss Capital,* the pre-*FW/PBS* cases predominantly involved censorship,[21]

---

[21]*Freedman,* and many of the Supreme Court decisions it spawned, concerned censorship of sexually explicit material. *See Vance v. Universal Amusement Co., Inc.,* 445 U.S. 308, 311, 100 S.Ct. 1156, 1158, 63 L.Ed.2d 413 (1980) (concerning obscene films)*; McKinney v. Alabama,* 424 U.S. 669, 674, 96 S.Ct. 1189, 1193, 47 L.Ed.2d 387 (1976) (considering state censorship authority); *Southeastern Promotions,* 420 U.S. 546, 550-552, 95 S.Ct. 1239, 1242-43, 43 L.Ed.2d 448 (concerning production of a musical in a municipal theater in violation of nudity and obscenity ordinances); *United States v. Thirty-Seven (37) Photographs,* 402 U.S. 363, 365-66, 91 S.Ct. 1400, 1402-03, 28 L.Ed.2d 822 (1971) (concerning the seizure of 37 photographs deemed to be "obscene" by customs agents); *Blount v. Rizzi,* 400 U.S. 410, 412, 91 S.Ct. 423, 426, 27 L.Ed.2d 498 (1971) (questioning the constitutionality of a statute which halted the use of the mails and of postal money orders for commerce in allegedly obscene materials); *Freedman,* 380 U.S. at 52 n. 2, 85 S.Ct. 734, 736, 13 L.Ed.2d 649 (considering the constitutionality of a statute

and *FW/PBS* was the first case to confront a licensing ordinance for adult entertainment establishments. *See* 187 F.3d at 1256. In *FW/PBS,* only a plurality of the Court was willing to relax *Freedman'*s third procedural safeguard in the less protected context of a sexually oriented licensing scheme. *See* 493 U.S. at 228, 110 S.Ct. at 606. In the case before us, the censored party lacks the business incentive to pursue review through the courts, and the speech at issue is core political speech in a public forum. Thus, once again, "[w]e believe this is a situation for 'treating unlike things differently according to their differences.' " *Boss Capital,* 187 F.3d at 1256 (quoting *Lyes v. City of Riviera Beach,* 166 F.3d 1332, 1342 (11th Cir.1999)). The right to speak sought by CAN in this instance deserves greater protection than that outlined by the plurality in *FW/PBS.* Accordingly, we decline to relieve the City of the requirement that its Street Closing Ordinance meet *Freedman'*s first procedural safeguard.

The City's Street Closing Ordinance provides that if the city manager or designee denies the applicant a Street Closing Permit he shall *request* the city attorney to initiate an enforcement action in the county's circuit court. *See* Gainesville Ord. § 23-42(c)(2). This provision, while it implies placement of the burden upon the City to initiate judicial proceedings, in effect, leaves the question of access to the unfettered discretion of the city attorney. The shift of discretion from the city manager, who made the decision, over to the city attorney makes little difference the provision still lacks a guarantee that the City will satisfy its burden of initiating judicial proceedings. As a result, the City's Street Closing Ordinance fails to fulfill the first procedural safeguard enumerated in *Freedman v. Maryland.* Without this safeguard, the Street Closing Ordinance is an unconstitutional prior restraint on speech. Accordingly, we must reverse the district court's grant of summary judgment in favor of the City as to the Street Closing Ordinance.

CONCLUSION

We hold that the district court did not abuse its discretion in granting CAN leave to file its notice of appeal out of time under Federal Rule of Appellate Procedure 4(a)(5). As to the substantive appeal, we reverse the district court's finding that the Sound Ordinance is not subject to facial challenge and hold that the Sound Ordinance is subject to a facial challenge. Lacking *Freedman*'s second procedural safeguard, we hold the Sound Ordinance constitutes an unconstitutional prior restraint on speech. Finally, we reverse the district court's finding that the Street Closing Ordinance fulfills each of *Freedman*'s procedural safeguards on the basis that it fails to ensure that the City will bear its burden of initiating litigation upon the denial of

directed at films which are "obscene," or which tend to "debase or corrupt morals or to incite crimes.").

a Street Closing Permit.

AFFIRMED in part, REVERSED in part.